IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| GLENN HEAGERTY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION FILE NO. |
| | ) | 1:18-cv-01233-CAP-CMS |
| EQUIFAX INFORMATION | ) | |
| SERVICES LLC and NATIONAL | ) | |
| CONSUMER TELECOM & | ) | |
| UTILITIES EXCHANGE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**REPLY BRIEF IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Craig E. Bertschi
Georgia Bar No. 055739
ceb@mcraebertschi.com
678.999.1102

Charles J. Cole
Georgia Bar No. 176704
cjc@mcraebertschi.com
678.999.1105

**MCRAE BERTSCHI & COLE LLC**
Suite 200, 1350 Center Dr.
Dunwoody, Georgia 30338

*Counsel for Plaintiff*

The issues in this case have narrowed considerably. Defendants now admit that Equifax obtained credit data from Mr. Heagerty's NCTUE credit file on more than 185 occasions. *See* Defendants' Response to Plaintiff's Statement of Material Facts [Docket #66], ¶ 33. Defendants admit that the credit data in question included Mr. Heagerty's account payment histories, the number of accounts in his name, the types of accounts he held, his credit available, his credit used and the length of his credit history. *Id.*, ¶¶ 17 and 25. Defendants admit that every time Equifax obtained credit data from NCTUE, the event was logged as an "inquiry" on Mr. Heagerty's NCTUE "data report." *Id.*, ¶¶ 27-28. Defendants admit that NCTUE "data reports" are "consumer reports." *Id.*, ¶¶ 18 and 6. And, remarkably, Defendants admit that Equifax did not have a permissible purpose to obtain Mr. Heagerty's NCTUE consumer report. Defendants' Response in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Defendants' Brief), p. 6. In light of these admissions and as explained below, Mr. Heagerty is entitled to summary judgment on the issue of Defendants' liability for willfully violating 15 U.S.C. §§ 1681b(a) and 1681b(f).

I. <u>MR. HEAGERTY SUFFERED A CONCRETE INJURY IN FACT</u>

When Defendants furnished/obtained Mr. Heagerty's NCTUE consumer report without a permissible purpose, he suffered a violation of his right to privacy and related emotional distress. In the context of the Fair Credit Reporting Act (the

"FCRA"), this Court has held that such injuries are "concrete" and sufficient to confer standing. *Ruk v. Crown Asset Management, LLC*, No. 1:16-CV-3444-LMM-JSA, 2017 U.S. Dist. LEXIS 41797 at *15-16 (N.D. Ga. March 22, 2017).

A. <u>Defendants' standing argument is contrary to the purpose of the FCRA and the express language of 15 U.S.C. § 1681b(a).</u>

On page 4 of their Brief, Defendants contend that Mr. Heagerty did not suffer a concrete injury in fact sufficient to confer standing because this case involved a "consumer reporting agency-to-consumer reporting agency exchange" of Mr. Heagerty's consumer report. That argument is patently meritless. 15 U.S.C. § 1681b(a) unequivocally states that a consumer reporting agency (a "CRA") "may furnish a consumer report under the following circumstances **and no other** …." *Id.* (emphasis added); *see also Ruk,* 2017 U.S. Dist. LEXIS 41797 at *23 (15 U.S.C. § 1681b(a)(3) provides an "exclusive list" of purposes for which a consumer report may be furnished). When crafting the "permissible purpose rule," Congress made no exception for CRA-to-CRA transfers, *i.e.* allowing one CRA to provide a consumer report to another CRA without a permissible purpose.[1]  "No other"

---

[1] Interestingly, Congress did exempt "communication of … information among persons related by common ownership or affiliated by corporate control" from the definition of the term "consumer report" and the reach of the FCRA. 15 U.S.C. § 1681a(d)(2)(A)(iii). The fact that Congress did not provide a similar exemption for CRA-to-CRA transfers of data suggests that such transfers are subject to the FCRA and give rise to actionable claims by consumers when they are made in violation of the permissible purpose rule.

means "no other." And, because the language of 15 U.S.C. § 1681b(a) is unambiguous, the Court should reject Defendants' invitation to judicially create an exception to the permissible purpose rule with this case. *Dodd v. United States*, 545 U.S. 353, 359 (2005) (when a "statute's language is plain, the sole function of the courts … is to enforce it according to its terms.")

B. <u>The case cited by Defendants, *Harmon v. RapidCourt, LLC*, is distinguishable.</u>

On pages 4-5 of their Brief, Defendants cite *Harmon v. RapidCourt, LLC*, No. 17-5688, 2018 U.S. Dist. LEXIS 197242 (E.D. Pa. November 20, 2018), for the proposition that CRA-to-CRA transfers of consumer reports cannot give rise to an injury in fact sufficient to confer standing. Defendants' reliance on *Harmon* is misplaced for several reasons.

First, *Harmon* was *not* a privacy case. The plaintiff in *Harmon* did not allege a violation of his right to privacy, a violation of the permissible purpose rule or a violation of 15 U.S.C. § 1681b(f). *Id*. at *3. Had the *Harmon* case involved a privacy claim, the outcome would have been different, because the Third Circuit has recognized that "the improper disclosure of one's personal data in violation of [the] FCRA is a cognizable injury for Article III standing purposes." *In re Horizon Healthcare Services, Inc. Data Breach*, 846 F.3d 625, 641 (3rd Cir. 2017).

Second, *Harmon* was an obsolete data case in which the plaintiff alleged that the consumer report that the defendants prepared on him "included criminal

charges older than seven years that did not result in any convictions" in violation of 15 U.S.C. § 1681c(a). 2018 U.S. Dist. LEXIS 197242 at *2. In its opinion, the *Harmon* court explained that, under the circumstances identified in 15 U.S.C. § 1681c(b), otherwise obsolete criminal record data *can* be included in consumer reports. *Id*. at *14. Thus, the defendants were *properly* in possession of the allegedly obsolete data, and as a result, "[a]ny embarrassment or frustration [the plaintiff] experienced … cannot constitute a concrete injury." *Id*. at *15. In this case, the facts are entirely different. Defendants did not "properly" furnish/obtain Mr. Heagerty's NCTUE consumer report. Equifax obtained Mr. Heagerty's NCTUE consumer report without a permissible purpose, and thereby violated his substantive right to privacy.

Third, Defendants' interpretation of the *Harmon* case would undermine the very purpose of the FCRA. If Defendants are correct, then *Harmon* stands for the proposition that CRAs are at liberty to access consumer reports in one another's files without a permissible purpose and do so with impunity. That is not the law, and if it is, then the privacy protections afforded by 15 U.S.C. § 1681b(a) have been materially compromised.

C. <u>What Equifax's ACIS operators did (or did not) see is irrelevant to the question of Mr. Heagerty's standing.</u>

In their Brief, Defendants make much of the fact that Equifax's ACIS operators saw only Mr. Heagerty's Insight Score, and not the raw credit data that

Equifax obtained from his NCTUE credit file.  In effect, Defendants contend that because no *human being* saw the *raw credit data* from Mr. Heagerty's NCTUE credit file, Mr. Heagerty's substantive right to privacy was not violated.  That argument is without merit for many reasons.  First, it ignores the fact that a credit score is also a consumer report and is confidential information.  *See 40 Years of Experience with the Fair Credit Reporting Act*, July 2011 ("*40 Years*"), p. 21, ¶ 6B and p. 20, ¶ 4; *Albu v. Home Depot, Inc.*, No. 1:15-CV-00412-ELR-JFK, 2016 U.S. Dist. LEXIS 185557 at *35, fn. 26 (N.D. Ga. November 2, 2016).  Thus, even under Defendant's theory, Mr. Heagerty's right to privacy was violated because Equifax's ACIS operators had no right to see his Insight Score.  Second, it assumes that corporate entities, like Defendants, cannot violate a consumer's right to privacy unless one of their human employees actually sees the confidential information.  Defendants offer no authority for that proposition.  Third, it invites the Court to establish a dangerous precedent.  Applying Defendants' logic, CRAs are at liberty to provide their corporate clients with credit data from consumers' files without a permissible purpose and do so with inpunity, as long the clients process that data in some way before it is shown to an employee.

II. THE DATA THAT EQUIFAX OBTAINED FROM MR. HEAGERTY'S NCUTE CREDIT FILE WAS A "CONSUMER REPORT"

The data that Equifax obtained from Mr. Heagerty's NCTUE credit file was a "consumer report."  That data was furnished to Equifax by NCTUE, which

Defendants admit is a CRA. Defendants' Response to Plaintiff's Statement of Material Facts [Docket #66], ¶ 2. That data clearly has "bearing" on Mr. Heagerty's "credit worthiness, credit standing" etc. And, that data was "collected" by NCTUE with an "expectation" that it would be used by NCTUE members for a permissible purpose, *i.e.* credit granting. *Id.*, ¶¶ 4-7. The data at issue, therefore, satisfies the requirements necessary to be a consumer report: the "creator," "content" and "purpose" requirements. 15 U.S.C. § 1681a(d) and *Yang v. Government Employees Ins. Co.*, 146 F.3d 1320, 1323 (11th Cir. 1998).

A. <u>The data that Equifax obtained from Mr. Heagerty's NCTUE credit file was *collected* by NCTUE with an *expectation* that it would be used for a permissible purpose.</u>

On pages 6-7 of their Brief, Defendants focus on the purpose requirement, arguing that the data Equifax obtained from Mr. Heagerty's NCTUE credit file was not a consumer report because Equifax did not use that information for one of the permissible purposes listed in 15 U.S.C. § 1681b(a). That argument erroneously assumes that the only way Mr. Heagerty can satisfy the purpose requirement is by proving that Equifax actually used the data it obtained from his NCTUE file for a permissible purpose. As the 11th Circuit explained in the *Yang* case, the purpose requirement is met if (1) the recipient "ultimately used" the information at issue for a permissible purpose, *or* (2) the CRA "expected" that the information would

be used for a permissible purpose *or* (3) the CRA "collected"[2] the information for a permissible purpose. *Yang*, 146 F.3d at 1324.

In this case, the purpose requirement is satisfied because NCTUE *collected* the data in Mr. Heagerty's credit file with an *expectation* that it would be used for a permissible purpose. To wit, it is undisputed that the data in NCTUE's database (1) comes from its members, (2) consists of credit data about consumers, (3) is sold to NCTUE members in the form of data reports, which are consumer reports, and (4) those consumer reports are used by NCTUE's members to make credit decisions regarding consumers. Defendants' Response to Plaintiff's Statement of Material Facts [Docket #66], ¶¶ 4-7. Thus, the data that NCTUE provided to Equifax meets both the collection and expectation of use components of the purpose requirement.

In light of the foregoing, Defendants' arguments regarding how Equifax ultimately used (or did not use) the data it obtained from Mr. Heagerty's NCTUE credit file are irrelevant. The fact that Equifax did not *use* the data to extend credit to Mr. Heagerty is irrelevant. The fact that Equifax *used* the data to create an Insight Score is irrelevant. The fact that Equifax *used* the data in a way that did not

---

[2]In 15 U.S.C. § 1681a(d), Congress used the word "collected" when defining a consumer report. In *Yang*, the Eleventh Circuit uses the words "collected" and "compiled" interchangeably and as synonyms.

reveal raw credit data to ACIS operators is also irrelevant. As long as NCTUE *collected* the data for a permissible purpose or did so with an *expectation* that its members would use that data for a permissible purpose, the purpose requirement is satisfied.

B. <u>Defendants' argument that Equifax did not obtain Mr. Heagerty's "entire" NCTUE credit file is a red herring.</u>

At the bottom of page 7 of their Brief, Defendants argue, in passing, that "Plaintiff has not produced any evidence that his entire NCTUE credit file … was ever provided to Equifax." This argument is a red herring and one that elevates form over substance. The definition of the term consumer report does not distinguish between "partial" and "entire" credit files, nor does it specify a particular format for consumer reports. If the information at issue satisfies the creator, content and purpose requirements, then it is a consumer report under the plain language of 15 U.S.C. § 1681a(d) and the 11th Circuit's decision in *Yang*.

Furthermore, adopting Defendants' logic on this argument would lead to absurd results. If the definition of consumer report is limited to a CRA's "entire file" on a consumer, then CRAs are free to publicize a consumer's confidential credit data (such as account balances, late payments, etc.), as long as the data does not comprise the consumer's "entire" file. Surely that was not Congress' intent when it enacted the FCRA.

Finally, it is contrary to representations that NCTUE made to Mr. Heagerty in the file disclosures it provided to him pursuant to 15 U.S.C. § 1681g. Those disclosures, which are Exhibits 41, 51 and 52 to the Deposition of Lisa Willis [Docket #50], plainly show that Equifax, using the pseudonyms "EISCOMPANY," "EIS/EQUIFAX," "ACIS" and "GESC" obtained Mr. Heagerty's NCTUE "data report" on at least 185 occasions. And, as noted above, Defendants admit that an NCTUE data report is a "consumer report." Defendants' Response to Plaintiff's Statement of Material Facts [Docket #66], ¶¶ 18 and 6.

C. <u>When attempting to distinguish the *Yang* case, Defendants misanalyze the collection and expectation of use components of the purpose requirement.</u>

On page 9 of their Brief, Defendants attempt to distinguish the *Yang* case by arguing that NCTUE (1) did not "provide … data to Equifax with the expectation that Equifax would use it for credit-related purposes" and (2) did not "compile … data so that Equifax could use it for credit-related purposes." These arguments are based on an erroneous interpretation of the "collection" and "expectation of use" components of the purpose requirement. The "collection" component of the purpose requirement refers to the reason why the data at issue was *originally* collected by the CRA, not why it was assembled or "compiled" for a particular user, like Equifax. Similarly, the "expectation of use" component of the purpose requirement refers to the CRA's expectation of how its data will be used in the ordinary course of its business, not how it will be used by any particular user, like

Equifax. This conclusion is apparent when one contrasts the 11th Circuit's decisions in *Yang* and *Hovater* and considers the Fifth Circuit's decision in *Johnson*.

In *Yang*, the Eleventh Circuit held that an Equifax "Inquiry Activity Report" or "IAR" was a consumer report. 146 F.3d at 1324. The data in the IAR was not "collected" by Equifax specifically for the "user" in that case, *i.e.* GEICO, but was the sort of data that Equifax customarily collects, such as personal identification information and a record of credit inquiries. *Id*. at 1321. Furthermore, although Equifax knew that GEICO would *not* be using the IAR for a permissible purpose, *i.e.* evaluating an insurance claim, the IAR was still a consumer report because, in internal reference materials, Equifax evidenced an expectation that IARs would be used "for … the specifically-enumerated [permissible] purposes outlined in" 15 U.S.C. § 1681b(a).

In contrast, in *Hovater v. Equifax, Inc.*, 823 F.2d 413 (11th Cir. 1987), the Eleventh Circuit held that a report that an Equifax private investigator prepared regarding an incident of arson was not a consumer report. The data at issue in *Hovater* was not data that Equifax collected in the ordinary course of its business as a CRA, but data specifically gathered for an insurer, including evidence that accused the plaintiff "of associating with known arsonists and of having accumulated large gambling debts." *Id*. at 414.

In light of the foregoing, it is clear that this case is more like *Yang* than *Hovator*. Here, the data that Equifax obtained from Mr. Heagerty's NCTUE credit file was collected by NCTUE in the ordinary course of its business, just like the data in the Equifax IAR in *Yang*, and unlike the data in the arson investigation report in *Hovator*. Similarly, NCTUE collected the data in Mr. Heagerty's credit file with an expectation that it would be used by NCTUE members for a permissible purposes, just like the data in the Equifax IAR in *Yang*, and unlike the data in the arson investigation report in *Hovator*.

Furthermore, to construe the collection and expectation of use components of the purpose requirement as Defendants do raises the very problem that the Fifth Circuit warned of in *St. Paul Guardian Insurance Co. v. Johnson*, 884 F.2d 881 (5th Cir. 1989). A CRA could knowingly furnish the information in consumers' credit files to users intent on blackmail, identity theft, or humiliation and embarrassment without violating the FCRA. Why? Because under Defendants' logic, the CRA would not have an expectation that the data at issue would be used for a permissible purpose. *Johnson*, 884 F.2d at 844.

D. <u>Mr. Heagerty's NCTUE credit data was provided to a third-party: Equifax.</u>

On pages 9-10 of their Brief, Defendants argue that *Yang* is also distinguishable because in that case the plaintiff's consumer report was sent to

GEICO, whereas in this case, Mr. Heagerty's credit data was not provided to a so-called "third-party." This argument misses the point for several reasons.

First, with respect to the data in Mr. Heagerty's NCTUE credit file, Equifax is a third-party. Equifax and NCTUE are distinct and separate corporate entities. Defendants' Response to Plaintiff's Statement of Material Facts [Docket #66], ¶ 11. The data in NCTUE's database is owned by NCTUE's members. Equifax is not a member of NCTUE and does not own any of the data in NCTUE's consumer credit files. *Id.*, ¶ 9-10.

Second, the fact that Equifax was a third-party in this context is also demonstrated by the "affiliate" exception to the definition of term consumer report. Under 15 U.S.C. § 1681a(d)(2)(A)(iii), the term "consumer report" does not include "communication of … of information among persons related by common ownership or affiliated corporate control …." The fact that Congress created a narrow exception to the definition of consumer report for affiliated entities, but declined to do so for CRA-to-CRA transfers of data, demonstrates that Equifax is a third-party in this context.

Finally, while Equifax may be a vendor to NCTUE, Equifax did not make the inquiries on Mr. Heagerty's NCTUE credit file at issue in this case in its capacity as a vendor to NCTUE. Rather, Equifax accessed Mr. Heagerty's NCTUE credit file in the process of handling disputes that Mr. Heagerty had made of

information *in his Equifax credit file,* not his NCTUE credit file. Defendants' Response to Plaintiff's Statement of Material Facts [Docket #66], ¶¶ 22-29.

E. <u>Defendants' own conduct and pre-suit admissions prove that the information Equifax obtained from Mr. Heagerty's NCTUE credit file was a consumer report.</u>

It is also worth noting that Defendants' position on this issue is contrary to their prelitigation conduct and course of dealing. As explained on pages 18-19 of the Brief filed in support of Mr. Heagerty's Motion for Partial Summary Judgment [Docket #48-1], the file disclosures that NCTUE provided to Mr. Heagerty pursuant to 15 U.S.C. § 1681g show that Equifax obtained data from Mr. Heagerty's NCTUE credit file using the pseudonyms, "EISCOMPANY," "EIS/EQUIFAX," "ACIS" and "GESC." Defendants' Response to Plaintiff's Statement of Material Facts [Docket #66], ¶ 29. Each time Equifax did so, that event was recorded as an inquiry and listed as such on the file disclosures that NCTUE provided to Mr. Heagerty pursuant to 15 U.S.C. § 1681g. *Id.*, ¶¶ 27-29. The file disclosures that NCTUE provided to Mr. Heagerty expressly state that: "This section lists the companies that requested your [NCTUE] data report." *Id.*, ¶ 28. And, critically, Defendants have admitted that an NCTUE "data report" is a "consumer report." *Id.*, ¶ 6. This analysis is also consistent with the Court's decision in *Steed v. Equifax Information Services, LLC*, No. 1:14-CV-0437-SCJ, 2016 U.S. Dist. LEXIS 185258 at *8 (N.D. Ga. August 31, 2016), which held that a "credit

inquiry … is a notation that communicates a fact—namely, who has obtained a copy of the *consumer's credit report.*" (Emphasis added.)

### III.  DEFENDANTS WILFULLY VIOLATED THE FCRA

The arguments advanced by Defendants on the issue of willfulness are largely addressed elsewhere in this Brief.  However, Defendant's discussion of Mr. Moore's deposition testimony and the issue of when NCTUE first learned that Equifax was obtaining NCTUE consumer reports without a permissible purpose warrants further discussion.  Even without Mr. Moore's testimony, the fact that NCTUE was aware of Equifax's activities as early as the summer of 2016 is indisputable.  In July 2016, an attorney representing Defendants expressly told Mr. Heagerty, in writing, that she had spoken "with someone at NCTUE" and learned that "the NCTUE system and the dispute resolution system at Equifax [ACIS] are linked together, and that is what caused the Inquiries to show up on the NCTUE report."  Declaration of Glenn Heagerty, [Docket #48-3], p. 14 of 20.  Furthermore, NCTUE listed the Equifax inquiries on consumer disclosures that it provided to Mr. Heagerty in May and July 2016.  Deposition of Lisa Willis, Exhibits 51 and 52 [Docket ##50-7 and 50-8].  If NCTUE was unaware of Equifax's activities, why did it list Equifax's inquiries on Mr. Heagerty's consumer disclosures?  Thus, while Mr. Moore may not have had actual knowledge of Equifax's activities until 2018, NCTUE is a corporate entity clearly did.

## IV. CONCLUSION

CRAs, like Defendants, possess and profit from vast databases of confidential consumer information. As a result, the law imposes on them "grave responsibilities" to "respect" consumers' rights to privacy." 15 U.S.C. § 1681(a)(4). In this case, Defendants did not honor their grave responsibilities, but were cavalier in their treatment of Mr. Heagerty's credit data, allowing Equifax to access and use that data without a permissible purpose. Yes, Equifax was a "steward" of the information in NCTUE's database, but that does not excuse its improper access to the information contained therein, any more than a physician who is allowed to see a patient undressed for the purpose of providing medical services would be excused for being a peeping Tom. By failing to respect the boundaries of its stewardship, Equifax willfully violated the FCRA. And, by allowing that to happen, NCTUE willfully violated the FCRA.

This 3rd day of July, 2019.

| | |
|---|---|
| **MCRAE BERTSCHI & COLE LLC**<br>Suite 200, 1350 Center Drive<br>Dunwoody, Georgia 30338<br><br>*Counsel for Plaintiff* | /s/ *Craig E. Bertschi*<br>Craig E. Bertschi<br>Georgia Bar No. 055739<br>ceb@mcraebertschi.com<br>678.999.1102<br><br>Charles J. Cole<br>Georgia Bar No. 176704<br>cjc@mcraebertschi.com<br>678.999.1105 |