# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

GLENN HEAGERTY,

         **Plaintiff,**

  **v.**

**EQUIFAX INFORMATION SERVICES LLC, and NATIONAL CONSUMER TELECOM & UTILITIES EXCHANGE, INC.,**

        **Defendants.**

**CIVIL ACTION FILE NO.**

**1:18-cv-01233-CAP-CMS**

## FINAL REPORT AND RECOMMENDATION

## AND ORDER

On March 23, 2018, Plaintiff filed a complaint in this Court against Defendants Equifax Information Services LLC ("Equifax") and National Consumer Telecom & Utilities Exchange, Inc. ("NCTUE") (collectively, "Defendants"), asserting violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681b and 1681e. [Doc. 1, Compl.].

This matter is presently before the Court on Defendants' joint Motion for Summary Judgment [Doc. 53], Plaintiff's cross Motion for Partial Summary Judgment [Doc. 48], and Plaintiff's Motion to Strike the Declaration of Meryl Roper [Doc. 73].

The motions have been fully briefed and are before me for consideration and a Report and Recommendation.

## I.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56; Ezell v. Wynn, 802 F.3d 1217, 1222 (11th Cir. 2015).  The moving party bears the initial burden of showing the court "the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact" and "an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 325 (1986); United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437-38 (11th Cir. 1991) (en banc).  "[T]he substantive law will identify which facts are material."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  If the moving party fails to discharge this initial burden, the motion must be denied.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993).

If the burden is met, however, the non-moving party must then "go beyond the pleadings and . . . designate 'specific facts showing that there is a genuine issue for trial.'"  Celotex Corp., 477 U.S. at 324 (citation omitted).  "A 'mere scintilla' of

evidence is insufficient; the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment." Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009) (citation omitted).   Mere conclusions and factual allegations unsupported by evidence are insufficient to survive a motion for summary judgment. See Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) (citation omitted).

The applicable summary judgment standard is not affected by the filing of cross-motions for summary judgment. See United States v. Oakley, 744 F.2d 1553, 1555-56 (11th Cir. 1984). "[T]he filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist." Floyd v. SunTrust Banks, Inc., 878 F. Supp. 2d 1316, 1321 (N.D. Ga. 2012).   Rather, when parties file cross-motions for summary judgment, "each side must still establish the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law." See Busby v. JRHBW Realty, Inc., 642 F. Supp. 2d 1283, 1288 (N.D. Ala. 2009).   The court must consider each motion independently, and in accordance with the Rule 56 standard. See Floyd, 878 F. Supp. 2d at 1321 (citation omitted); see also Teal v. Gibbs, No. 4:10-CV-840-VEH, 2011 WL 13229629, at *2 (N.D. Ala. June 28,

2011) ("Although there are cross-motions for summary judgment, each side must still establish the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law.") (citations omitted).

## II.  PLAINTIFF'S ALLEGATIONS

As set forth in Plaintiff's Complaint and in his declaration, in the spring of 2016, Plaintiff Glenn Heagerty ("Plaintiff") decided to check his Equifax credit report to make sure that it was accurate.  Accordingly, he contacted Equifax and asked for a copy of his credit file.  [Doc. 1, Compl; Doc. 48-3, Declaration of Glenn Heagerty ("Pl.'s Decl."), ¶ 3].  Section 1681g of the FCRA provides that upon request, consumer reporting agencies ("CRAs"), including Equifax, are required to "clearly and accurately disclose to the consumer: . . . [a]ll information in the consumer's file at the time of the request," "[t]he sources of the information," and also the "identification of each person . . . that procured a consumer report" on the consumer during the previous year.  15 U.S.C. § 1681g(a)(1)–(3).  On June 3, 2016, Plaintiff received the requested file disclosure.  [Compl. ¶ 9].

After receiving his Equifax file disclosure, Plaintiff reviewed the list of companies that had obtained a copy of his Equifax consumer report.  [Pl.'s Decl. ¶ 4].  Plaintiff noticed that a company called "Eqxncatt" had obtained his Equifax credit report on several occasions in 2014 and 2015.  [Id.].  According to Plaintiff, he

4

became concerned because he had never heard of "Eqxncatt," and he had never authorized a company by that name to obtain his Equifax consumer report.  [Id.].

To investigate the situation, Plaintiff called the telephone number for Eqxncatt listed on his Equifax file disclosure.  Plaintiff was told that "Eqxncatt" was "The Exchange Service Center," which was affiliated with Defendant NCTUE. [Pl.'s Decl. ¶ 5].  After doing some research, Plaintiff learned that NCTUE is also a credit reporting agency, or CRA.  According to Plaintiff, he did not understand why one CRA, Equifax, would be providing a copy of his credit report to another CRA, NCTUE. [Id. ¶ 6].  To investigate, Plaintiff asked NCTUE to provide him with a copy of his NCTUE credit file.  [Id. ¶ 7].

In June 2016, Plaintiff received his NCTUE file disclosure report dated May 31, 2016, and reviewed the list of companies that had requested his NCTUE "data report" or made inquiries concerning Plaintiff's NCTUE "data report."[1]  [Doc. 48-3 at 8-11, ("May 31, 2016 NCTUE File Disclosure Report")].  After reviewing his May 31, 2016 NCTUE File Disclosure Report, Plaintiff saw that companies described as

---

[1] Although NCTUE apparently refers to the information it compiles on consumers as "data reports," both NCTUE and Equifax have admitted that "NCTUE data reports are consumer reports."  [Doc. 48-5 at 6 ¶ 15; Doc. 48-4 at 5 ¶ 10; see also Doc. 48-3 at 9–11].  Moreover, the May 31, 2016 NCTUE File Disclosure Report notes that "[t]he terms 'credit report,' consumer report' and 'credit file' as may be used in this notice" are used interchangeably, and "refer to your data report provided in this disclosure." [Doc. 48-3 at 9].

"EISCOMPANY" and "EIS/EQUIFAX" had accessed his NCTUE credit file or data report on at least 73 occasions, beginning in June 2014.  It is undisputed that "EISCOMPANY" and "EIS/EQUIFAX" are pseudonyms for Equifax.  [Doc. 48-4 (Ex. B, Defendant Equifax's Objections and Responses to Plaintiff's First Requests for Admission), ¶¶ 24-25; Doc. 48-5 (Ex. C, Defendant NCTUE's Objections and Responses to Plaintiff's First Request for Admissions) ¶¶ 29-30].

On July 8, 2016, Plaintiff emailed attorney Meryl W. Roper with King & Spalding (who had represented Equifax in prior unrelated litigation with the Plaintiff) summarizing their earlier telephone conversation and alleging that Equifax had obtained 73 consumer reports from NCTUE without a permissible purpose and under false pretenses, in violation of the FCRA.  [Doc. 48-3 at 14-15].  Plaintiff raised the possibility that King & Spalding had been involved in obtaining his NCTUE credit report, and stated that it was "terrifying to think people were monitoring me during the case, violating my privacy, what information was obtained, what was done with it, who all got it, where is it now, how many other individuals has this happened to? So many questions, no answers."  [Doc. 48-3 at 15].

In response, on July 12, 2016, Ms. Roper wrote, in pertinent part:

> I have had the opportunity to speak with someone at NCTUE and have learned additional information that should hopefully put your mind at ease.  The NCTUE

system and the dispute resolution system at Equifax Information Services are linked together, and that is what caused the inquiries to show up on the NCTUE report. In order to address your concerns and allegations in the prior lawsuit, it was necessary for attorneys at my firm to speak with Equifax and pull up your Equifax credit file to determine how accounts . . . were reporting and whether changes needed to be made. Each time we needed to address your file, it created the inquiry on the NCTUE report and multiple updates would cause multiple entries on the same day. These inquiries were the direct result of your former lawsuit, and therefore there is no basis to say there was an impermissible purpose to access your file. I can assure you that nobody was monitoring you or trying to violate your privacy. There was no consumer report provided from NCTUE to Equifax Information Services. Moreover, as we discussed on Friday, no third party obtained the information and this had no impact on a credit score or ability to receive credit.

[Doc. 48-3 at 14].

Plaintiff states that he spent the next eighteen months trying to get an explanation for why Equifax had obtained his NCTUE credit report 73 times without his authorization. According to Plaintiff, because the explanations were confusing and ultimately unsatisfactory, he retained counsel and filed this lawsuit. [Doc. 48-1 at 5; Pl.'s Decl. ¶¶ 10-11].

## III.  FACTS

In light of the foregoing summary judgment standard, the Court finds the following facts for the purpose of resolving the parties' cross-motions for summary

judgment only.  The following facts are undisputed.

### *Equifax, NCTUE, and the Insight Score*

Plaintiff is an individual and a "consumer" as defined under the FCRA, 15 U.S.C. 1681a(c).  [Doc. 48-2, Pl.'s Stmt. of Mat. Facts ("PSMF") ¶ 1].

Equifax is a CRA as defined under the FCRA.  [Doc. 53-2, Defs.' Stmt. of Mat. Facts ("DSMF") ¶ 1].  As such, it gathers information about consumers from various sources, including banks, collection agencies, and court records, which it uses to create credit files on consumers in the United States, including Plaintiff.  [Id. ¶ 2].  Equifax owns a database containing credit data on hundreds of millions of U.S. consumers, including Plaintiff.  [Doc. 48-4 at 6 ¶ 14].  Equifax uses those files to prepare consumer reports for use by its subscribers in evaluating the potential credit risk of consumers, among other permissible purposes.  [DSMF ¶ 3].

NCTUE is also a CRA under the FCRA.  [DSMF ¶ 6].  The information contained in NCTUE's database comes from its members, who are companies in the telecommunications, pay TV, and utilities industries, such as AT&T, DirecTV, and Georgia Power.  [Id. ¶ 7; Doc. 48-5 at 5 ¶¶ 10–12].  The credit data supplied by NCTUE's members includes information about consumers' account history, unpaid closed accounts, and customer service applications.  [Doc. 48-5 at 5 ¶ 9].  NCTUE's database contains information on more than 200 million U.S. consumers, including

8

Plaintiff.  [Id. ¶ 5].  NCTUE sells the information in its database to its members in the form of "data reports," which Defendants admit are "consumer reports" under the FCRA.  [Id. ¶¶ 14–15; Doc. 48-4 ¶¶ 9–10].  NCTUE's members use NCTUE consumer reports in making decisions to extend services to consumers and other permissible purposes under the FCRA.  [Doc. 48-5 ¶ 17].

Equifax and NCTUE are separate companies, and each maintains its own separate database of consumer credit files and account information.  [DSMF ¶¶ 8, 23–24].  Equifax is not a member of NCTUE.  [Doc. 48-5 ¶ 19].  Nor does it own the data in NCTUE'S database.  [Doc. 51, Deposition of Alan Moore[2] ("Moore Dep."), at 14].  There is no common ownership between Equifax and NCTUE.  [Id. at 24–25].  NCTUE, however, does not have any employees.  Instead, NCTUE has retained Equifax, as an outside vendor or independent contractor, to host and maintain NCTUE's database of consumer data and to provide certain operational services for NCTUE.  [DSMF ¶ 9].  The services performed by Equifax in its role as a vendor for NCTUE include: (1) sending consumers copies of their NCTUE data file disclosures

_____

[2]  Alan Moore manages NCTUE's day-to-day operations as NCTUE's executive director, and works on behalf of NCTUE's board of trustees on an independent contractor basis.  [Moore Dep. at 10–12].

 Unless otherwise indicated, citations to the record are to the CM/ECF electronic heading at the top of the page cited.  However, citations to deposition transcripts are to the actual page number of the hardcopy deposition transcript.

upon request, and (2) conducting reinvestigations of disputes by consumers concerning the accuracy of their NCTUE data files.  [Id. ¶ 10].  Equifax performs these services pursuant to a written contract with NCTUE.  [Id. ¶ 11; see Docs. 50-3 and 50-4, Amended and Restated Contractor Services Agreements by and between NCTUE, and Equifax, "an independent contractor ('Contractor')," dated June 10, 2008 and September 1, 2015 (hereinafter, collectively, the "Contract")].  Under the terms of the Contract, Equifax agrees to "comply with the provisions of the FCRA, the Fair and Accurate Credit Transaction Act," and all other applicable federal consumer credit protection statutes, all state law counterparts thereof, and all applicable regulations promulgated thereunder.  [DSMF ¶ 12].

As independent CRAs, Equifax does not include NCTUE's consumer data in its own consumer reports that it provides to third parties, and NCTUE does not include Equifax's consumer data in its own consumer reports that are provided to third parties through Equifax as its vendor.  [DSMF ¶¶ 25–26].  However, Equifax has created a credit risk score called the "Insight Score" for use in retail banking that utilizes data contained in NCTUE's database as well as Equifax's credit files.  [Doc. 50, Deposition of Lisa Willis as a 30(b)(6) representative for Equifax ("Willis Dep."), at 26–28, Ex. 54; Doc. 48-7, Equifax's Responses to Pl.'s Second Set of Interrogatories, Resp. ¶ 3].  According to internal Equifax documents,

the "Insight Score" is an additional scoring model that will allow Creditors/Data Furnishers the ability to make better calculated risks when considering an individual's credit history. The Insight Score is the combination of a consumer's credit history information along with his/her utility history information formulated through a risk model to create a score.

[Doc. 50-6 at 97].   Upon request, consumers may purchase their Insight Score from Equifax.  [Id.].  The score is designed "to assist in predicting credit risk for individuals who may not have any or a lot of traditional credit."  [Willis Dep. at 27].

As a CRA, Equifax is obligated to conduct "reinvestigations" when consumers dispute the accuracy or completeness of information contained in their Equifax credit file.  15 U.S.C. § 1681i(a).   To reinvestigate and track consumer disputes, Equifax uses a software platform called "ACIS," which is an acronym for "Automated Consumer Interview System."  [Doc. 48-6, Equifax's Objections and Responses to Pl.'s Second Requests for Admission, Resp. ¶¶ 1–2].  When an Equifax ACIS operator accesses a consumer's Equifax credit file to conduct a dispute reinvestigation, the ACIS system automatically, and without prompting, provides the ACIS operator with the consumer's Insight Score that is viewable on the operator's computer screen. [DSMF ¶ 39; Willis Dep. at 66–67; Doc. 49, Deposition of Celestina Gobin as a 30(b)(6) representative for Equifax ("Gobin Dep.") at 88, 90–91]. The operators are also able to view the Insight Score if they access an Equifax consumer's file to do

other things (such as process a request for a consumer disclosure, add a fraud alert to the consumer's file, answer a question a consumer has about their file), or during other consumer-initiated contacts with Equifax. [DSMF ¶ 41].

The Insight Score is calculated using an algorithm that incorporates elements from the consumer's Equifax and NCTUE files. [DSMF ¶ 40]. To generate the Insight Score, Equifax obtains the following information and/or data from consumers' NCTUE credit files: the number of accounts, the type of accounts, the credit used, the credit available, the length of credit history, and the payment history. [Doc. 48-7 ¶ 3; Willis Dep. at 31]. However, the Equifax operators are not able to see or otherwise access the full NCTUE data file or any of the data used to calculate the Insight Score; their view is limited to the Insight Score only. [DSMF ¶¶ 42–43].

Every time Equifax obtains this information from a consumer's NCTUE credit file to generate an Insight Score, that event is recorded as an "inquiry" on the consumer's NCTUE data report. [Willis Dep. at 29–30, 44–47, 49, and Exs. 41, 51, and 52 thereto]. An "inquiry" is "[a]n instance in which all or part of a consumer's credit file is accessed by a company" [Doc. 51-8 at 20], or a company has requested a consumer's data file or data report [Willis Dep. at 34]. There are different types of inquiries: soft inquiries, hard inquiries, and promotional inquiries. [Doc. 51-8 at 20]. According to Lisa Willis, one of Equifax's 30(b)(6) witnesses, a "soft inquiry" is

"a third party requesting information from the file.  It's not a part of the score calculations as far as how it contributes to another party being able to calculate a [credit] score."  [Willis Dep. at 37].  A "soft inquiry" is recorded where a credit report is accessed without affecting a consumer's credit rating, and can also occur when a consumer requests his or her credit report, or a consumer's existing creditor conducts an account review.  [Doc. 51-8 at 25].  A "hard inquiry" is when a consumer "has applied for credit," and the potential creditor requests access to the consumer's credit file.  [Id. at 38].  According to Lisa Willis, the inquiries recorded on Plaintiff's May 31, 2016 NCTUE File Disclosure Report were soft inquiries.[3]  [Willis Dep. at 38, 44–47, 49].

It is undisputed that the generation of an Insight Score is unnecessary to the reinvestigation of consumer disputes.  In response to interrogatories served by Plaintiff, Equifax admitted that "it does not use the Insight score as part of its reinvestigations of consumer disputes."  [Doc. 48-7 at 5, Resp. ¶ 4].  When asked why Equifax automatically generates an Insight Score every time an ACIS operator accesses a consumer's Equifax file, Equifax's 30(b)(6) witness, Celestina Gobin, testified, "It's a convenience.  It's simply a resource to give good customer service.  If a customer called and said . . . 'I need to purchase . . . my Insight Score,' then the

---

[3]  Promotional inquiries are not at issue in this lawsuit.

agent [ACIS operator] could process that [request]." [Gobin Dep. at 89]. However, that scenario is one that evidently rarely, if ever, occurs. Another Equifax 30(b)(6) witness, Lisa Willis, testified that in her twenty-three years with Equifax, she has never had a consumer ask for an Insight Score or had an ACIS operator ask for assistance in understanding or providing the Insight Score. [Willis Dep. at 64, 68–69].

### *Equifax Obtains Plaintiff's NCTUE Information*

Since 2014, Plaintiff has disputed the accuracy and completeness of information contained in his Equifax credit file on numerous occasions. [Doc. 48-8, Equifax's Objections and Responses to Pl.'s First Set of Interrogs., at 7–8, Resp. ¶ 9]. Following its general procedures for reinvestigating consumer disputes, Equifax reinvestigated Plaintiff's disputes using its ACIS software platform. [Gobin Dep. at 10–11, 16–17, 21–78, and Exs. 1–38 thereto]. As noted above, each time an ACIS operator accessed Plaintiff's Equifax credit file, an Insight Score was generated using information from Plaintiff's NCTUE and Equifax credit files, and displayed to the ACIS operator. [Willis Dep. at 28, 44–47, 66–67, and Exs. 41, 51 and 52 thereto; Gobin Dep. at 88]. The information obtained from Plaintiff's NCTUE credit file to create the Insight Score included Plaintiff's account payment history, the number of accounts in his name, the type of accounts he held, his available credit, his credit used,

and the length of his credit history.  [Doc. 48-7 at 4, Resp. to Interrog. No. 3].  It is undisputed that Equifax did not need to generate an Insight Score on Plaintiff or access data in his NCTUE credit file to reinvestigate any of the disputes that Plaintiff made regarding the information in his Equifax credit file.  [Gobin Dep. at 21–78].

As noted above, when Equifax accessed Plaintiff's NCTUE credit file to generate an Insight Score, that event was recorded as an "inquiry" and listed on Plaintiff's NCTUE file disclosure.  [Willis Dep. at 33–36, 44–47, 49, and Exs. 51, 52, and 41].

The sections of Plaintiff's May 31, 2016 NCTUE File Disclosure Report that list the inquiries contain the following prefatory and explanatory language:

> Companies that inquired on your [NCTUE] data report based on a service request that you initiated.  This section lists the companies that requested your [NCTUE] data report.
> . . .
>
> Companies that inquired on your data report based on an account review or an inquiry that was initiated based on a maintenance transaction to your data report.  This section includes inquiries which display only to you and are not considered when evaluating your creditworthiness. Examples of this inquiry type include a periodic account review by an existing service provider.

[Doc. 50-7 at 1–2].  The companies that are listed as having inquired or requested Plaintiff's NCTUE "data report" are "EISCOMPANY," "EIS/EQUIFAX," "ACIS,"

and "GESC," which are all pseudonyms for Equifax and/or its ACIS system.  [Doc. 48-4 at 9, Resp. ¶¶ 24–25; Willis Dep. at 35–36, 39–40, 49].

### NCTUE Demands that Equifax Stop Accessing NCTUE Data Reports

NCTUE's 30(b)(6) witness, Mr. Alan Moore, who serves as its executive director, gave sworn testimony at his deposition (taken on January 15, 2019) that "sometime in the summer of 2016," he learned that when ACIS operators accessed consumers' Equifax credit files, ACIS was generating Insight Scores on the consumers, which was causing "a hit on the [consumers'] NCTUE file," including Plaintiff's.  [Doc. 51, Moore Dep., at 4, 8, 31–34, 37].  Mr. Moore testified that once he was alerted to this situation, he asked NCTUE's outside counsel with the Baker Donelson law firm to instruct Equifax to stop the practice that was causing inquiries on Plaintiff's NCTUE file.  [Id. at 36].

In support of Defendants' response in opposition to Plaintiff's motion for partial summary judgment, Mr. Moore has submitted a second declaration, dated June 14, 2019, stating that after he reviewed Plaintiff's motion for partial summary judgment, which relies in significant part on Mr. Moore's deposition testimony, Mr. Moore reviewed his deposition transcript, "reflected on the timing of these events further," and "realized that they occurred in 2018, after the present lawsuit was filed, and not in 2016."  [Doc. 65, Declaration of Alan Moore ("Second Moore Decl."), at 2].

Attached as an exhibit to the Second Moore Declaration is a copy of an errata sheet, dated March 2019, that Mr. Moore completed, asking that his deposition testimony be corrected to reflect the following:   "After reviewing the deposition, I realized my recollection of the date NCTUE learned the Insight Score was made available to ACIS operators when they accessed a consumer's Equifax file was incorrect.  The correct date was spring or late summer 2018."  [Doc. 65-1 at 1].

## IV.   PLAINTIFF'S MOTION TO STRIKE

Plaintiff has moved to strike the declaration of Meryl W. Roper [Doc. 71-1], attorney with the law firm of King & Spalding, which was submitted to this Court as an exhibit to the reply brief that Defendants filed in support of Defendants' motion for summary judgment [Doc. 53].  The declaration avers that Plaintiff's reliance (in his response to Defendants' motion for summary judgment) on Ms. Roper's July 12, 2016 email response to Plaintiff (as set forth in the fact section of this R&R) is misplaced because some statements in her email were incorrect, as was Plaintiff's belief that she represented both Equifax and NCTUE when she sent the subject email to Plaintiff. [Doc. 71-1, Declaration of Meryl W. Roper ("Roper Decl."), ¶¶ 4–6].

The Roper Declaration, in pertinent part, states the following:

> 3.   I have reviewed Plaintiff's Opposition to Defendants' Motion for Summary Judgment in this case,

17

including the reference to my email to Plaintiff dated July 12, 2016.

4.      Although my email states that I contacted NCTUE, that is incorrect.   I did not speak with anyone on the NCTUE Board of Directors or otherwise with NCTUE.

5.      Instead, I spoke with a former employee of Equifax who was at that time in charge of handling Equifax's work for NCTUE related to consumer disputes and disclosures.

6.      I did not represent NCTUE when I sent the subject email to Plaintiff.

[Doc. 71-1].[4]

Plaintiff argues that Ms. Roper's declaration does not simply "clarify a misstatement" as Defendants assert; instead, it flatly contradicts and retracts material representations that she made to Plaintiff in her July 2016 email.   Plaintiff further argues that Defendants were on notice of Plaintiff's reliance on the statements made in Ms. Roper's email no later than May 13, 2019, when Plaintiff filed his motion for partial summary judgment and "unequivocally took the position that: (1) Ms. Roper

_____

[4]  I note that King & Spalding now does represent NCTUE.  Indeed, Equifax and NCTUE have filed a single joint motion for summary judgment.

was acting as legal counsel to *both* Equifax and NCTUE and (2) based on a July 12, 2016 email [Plaintiff] received from Ms. Roper, NCTUE personnel were aware of the fact that Equifax was . . . improperly accessing his [Plaintiff's] NCTUE credit file." [Doc. 75, Pl.'s Reply Br., at 3]. Plaintiff argues that Ms. Roper's declaration directly contradicts both of these propositions, and by waiting until Defendants filed their reply brief instead of serving the declaration as part of their original motion, or in response to Plaintiff's cross motion for summary judgment, Defendants have violated Rule 6(c)(2) of the Federal Rules of Civil Procedure and Local Rule 7.1(A)(1).[5] [Doc. 73, Pl.'s Motion, at 3].

According to Plaintiff, by filing the declaration with their reply brief, Plaintiff has no way to rebut it with evidence or argument, thereby prejudicing Plaintiff and leaving the Court to decide Defendants' motion for summary judgment based on an incomplete record. Plaintiff therefore moves the Court to strike the declaration as untimely, and asks that the Court not consider it in support of Defendants' motion for summary judgment.

In response, Defendants argue that the reason they submitted the Roper Declaration was not as part of their affirmative motion for summary judgment, but

---

[5] Rule 6(c)(2) provides that "[a]ny affidavit supporting a motion must be served with the motion." Fed. R. Civ. P. 6(c)(2). Local Rule 7.1(A)(1) provides that "supporting affidavits must be attached to the memorandum of law." LR 7.1(A)(1), NDGa.

rather in response to Plaintiff's efforts in his response brief to Defendants' motion for summary judgment "to bolster his emotional distress claim by citing to an email exchange with Meryl Roper."  [Doc. 74 at 1].  According to Defendants, they submitted the declaration "to clarify and respond to mischaracterizations made by Plaintiff about the exchange" in Plaintiff's response brief.  [Id.].  Defendants cite Mattress Safe, Inc. v. J.T. Eaton & Co., Inc., No. 1:18-cv-2915-MHC, 2019 WL 2714498, at *3 (N.D. Ga. Jan. 15, 2019) for the proposition that "a movant may make supplemental records submissions in a reply brief to rebut specific arguments raised by the nonmovant's opposition brief." [Doc. 74 at 3].  Defendants acknowledge that in order to be considered, the declaration must be submitted "only for the limited purpose of responding to matters raised in the responses filed by opposing parties."  [Id., citing Carlisle v. Nat'l Commercial Servs., Inc., No. 1:14-cv-515-TWT, 2015 WL 4092817, at *1 (N.D. Ga. July 7, 2015) (citations and quotation marks omitted)].

To resolve this motion to strike, the Court will examine the declaration to which Plaintiff objects to determine whether the substance of the declaration should be considered as a proper response to the assertions raised by Plaintiff in his opposition response brief and permitted, or whether the declaration should not be considered as an attempt to raise new issues or bolster previous evidentiary submissions.  See Mattress Safe, 2019 WL 2714498, at *3.

20

On pages 17–19 of Plaintiff's response brief to Defendants' motion for summary judgment, Plaintiff addresses Defendants' argument that his claim for damages for emotional distress is based solely on speculation or a misapprehension of the facts because Plaintiff believed his NCTUE credit-related information was being invaded by parties "who have no legitimate need for it." [Doc. 62 at 17–19]. In response to Defendants' argument that Plaintiff's emotional distress claim is insufficient to confer Article III standing because it is based on "misconceptions regarding his fear of Equifax's attorneys viewing his NCTUE consumer report," Plaintiff explains that at the time he first received his NCTUE consumer file disclosure in June 2016, he had no knowledge that any actions of Equifax's attorneys caused some of the inquiries on his NCTUE credit file.  [Id. at 19].  Plaintiff explains that in early July 2016, however, he had a telephone call and email exchange with King & Spalding attorney Meryl Roper, "who was representing both Equifax and NCTUE," wherein she told Plaintiff that she had spoken with "someone at NCTUE and have learned additional information that should hopefully put your mind at ease." [Id., quoting the July 12, 2016 email].  Plaintiff asserts that "far from putting his mind at ease," the information provided by Ms. Roper—that actions taken by Equifax's lawyers resulted in the inquiries on his NCTUE credit file—was "terrifying" to

21

Plaintiff, and contributed in significant part to Plaintiff's emotional distress.  [Id. at 20].

Defendants argue that even if Plaintiff did refer to the email exchange in his own cross-motion for summary judgment, his citation was limited to the purpose of trying to establish that NCTUE had "*actual knowledge* that Equifax was accessing NCTUE credit files when reinvestigating consumer disputes" [Doc. 48-1 at 24], not in order to show emotional distress or Article III standing [Doc. 62 at 18–20].  Thus, to the extent Plaintiff is claiming his motion for summary judgment put Defendants on notice, Defendants argue they had no way of knowing, at the time they filed their cross-motion for summary judgment, that Plaintiff would rely on the email exchange in support of his claim for emotional damages and to support his standing/injury-in-fact argument.

The proper method for challenging the admissibility of evidence in an affidavit or declaration submitted in connection with a motion for summary judgment is to file a notice of objection to the challenged testimony or evidence.  Jordan v. Cobb County, Ga., 227 F. Supp. 2d 1322, 1346–47 (N.D. Ga. 2001).  However, to the extent Plaintiff's motion is raising evidentiary objections to the Roper Declaration, courts have concluded that "[r]ather than striking a document or a portion thereof, it is usually more appropriate to consider a party's objections to affidavits which are filed

in support of a motion for summary judgment when ruling on the merits of a motion for summary judgment." Taco Maker, Inc. v. Bush, Slipakoff & Schuh, LLP, No. 1:09-CV-3293-RWS, 2013 WL 1773819, at *1 (N.D. Ga. Apr. 24, 2013) (citing Haynes v. Twin Cedars Youth and Family Servs., No. 5:10-CV-321 (CAR), 2012 WL 895699, at *5 (M.D. Ga. Mar. 15, 2012)). When addressing the merits of a motion for summary judgment, courts have the discretion to strike or disregard the improper portions of an affidavit submitted in connection with a summary judgment motion, and consider the remainder of the testimony or statement. Id. (citation omitted).

I have carefully considered the parties' arguments, briefing materials, and case law cited. After due consideration, I find that the Roper Declaration is narrowly tailored to rebut specific arguments raised by Plaintiff in his opposition brief to Defendants' motion for summary judgment regarding emotional distress damages. Accordingly, rather than strike the declaration, I will exercise my discretion to consider the declaration in connection with Defendants' motion for summary judgment and the emotional distress issue. Plaintiff has pointed to no evidence of bad faith on Defendants' part in filing this declaration. Accordingly, for the reasons stated, Plaintiff's motion to strike the Roper Declaration [Doc. 73] is **DENIED**.

# V.  **DISCUSSION**

In his three-count Complaint, Plaintiff brings claims under three different, but related, sections of the FCRA.  [Doc. 1 at 8–12].  In Count One, Plaintiff alleges that both Equifax and NCTUE violated Section 1681b(a), which sets out the permissible purposes for which a CRA may furnish a consumer report to "a person."  15 U.S.C. § 1681b(a).  In Count Two, Plaintiff alleges that NCTUE violated Section 1681e(a), which requires CRAs to maintain reasonable procedures designed to ensure that consumer reports are furnished only for the limited permissible purposes set out in Section 1681b.  Finally, in Count Three, Plaintiff alleges that Equifax violated Section 1681b(f), which prohibits "a person" from using or obtaining a consumer report for any purpose other than those specifically authorized under the statute.  Plaintiff alleges each statutory violation, in the alternative, as being either negligently or willfully done.

In their motion for summary judgment, Defendants argue that all claims in the Complaint should be dismissed for several independent reasons.  First, Defendants argue that Plaintiff has no Article III standing to bring his claims because Plaintiff has shown no evidence of any injury resulting from the alleged FCRA violations.  [Doc. 53-1 at 7–15].  Second, Defendants argue that each of Plaintiff's claims require evidence that Equifax accessed (and NCTUE provided) a "consumer report."

According to Defendants, the NCTUE information at issue in this case does not meet the definition of "consumer report" under the FCRA.   [Id. at 16–20].   Third, Defendants argue that even if there is standing and even if the accessed information qualifies as a "consumer report" under the FCRA, Defendants are still entitled to summary judgment because there is no evidence that the "consumer report" was ever distributed to a third party.   [Id. at 20–21].   Beyond these three arguments, NCTUE separately contends that it is entitled to summary judgment on Count Two because NCTUE had reason to believe that Equifax had a permissible purpose for the information when Equifax accessed it.   [Id. at 21–23].   Alternatively, Defendants argue that they are entitled to judgment as a matter of law that they did not willfully violate any provision of the FCRA.   [Id. at 23–25].

Plaintiff has limited his motion for partial summary judgment to the issue of liability on certain of his claims.   Plaintiff argues that he is entitled to judgment as a matter of law on his claims for willful violation of the FCRA as alleged in Counts One and Three.   [Doc. 48-1 at 20–25].   Plaintiff has not moved for summary judgment on Count Two or for his claims of negligent violation of the FCRA as alleged in Counts One and Three.   For the reasons that follow, I recommend that both Plaintiff's and Defendants' motions for summary judgment be denied.

## A.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants first argue that they are entitled to summary judgment for the following reasons: (1) because Defendants did not invade Plaintiff's privacy, Plaintiff has no injury-in-fact and therefore lacks Article III standing to sue, and (2) the Insight Scores at issue in this lawsuit were not consumer reports.  [Doc. 53-1 at 2].

In response, Plaintiff argues that Defendants have misframed his claims. According to Plaintiff, he does not contend that the Insight Scores that Equifax generated using his NCTUE credit data are consumer reports.  Rather, Plaintiff contends that the consumer reports at issue in this case consist of the credit data that Equifax obtained from Plaintiff's NCTUE credit file, including his account payment history, the number of accounts in his name, the type of accounts that he held, the credit used, the credit still available, the length of Plaintiff's credit history, and Plaintiff's payment history.  [See Doc. 62 at 20; Doc. 48-7, Resp. to Interrog. No. 3; Willis Dep. at 31].  Plaintiff contends he has a legally protected and substantive right to privacy with respect to the data in his NCTUE credit file under the FCRA, Supreme Court precedent, and decisions of the Eleventh Circuit and this Court.  Plaintiff contends that his right to privacy was violated when Equifax accessed the data in Plaintiff's NCTUE credit file without a permissible purpose, causing him to suffer

violations of his right to privacy and emotional distress.  Plaintiff contends both are concrete injuries-in-fact sufficient to confer Article III standing.  [Doc. 62 at 4–5].

### 1.     Plaintiff Has Made a Sufficient Showing to Establish Article III Standing

Article III of the Constitution of the United States "restricts the jurisdiction of the federal courts to litigants who have standing to sue."  Pedro v. Equifax, Inc., 868 F.3d 1275, 1279 (11th Cir. 2017) (quoting Nicklaw v. CitiMortgage, Inc., 839 F.3d 998, 1001 (11th Cir. 2016)).  This threshold requirement "must be addressed prior to and independent of the merits of a party's claims."  Id. (quoting Common Cause/Ga. v. Billups, 554 F.3d 1340, 1349 (11th Cir. 2009) (citation omitted)).   As the party invoking federal jurisdiction, Plaintiff "bears the burden of proving standing."  Id. (citation omitted).

The leading case on the issue of standing to assert claims under the FCRA is Spokeo, Inc. v. Robins, 136 S. Ct. 1540 (2016).  Under Spokeo, to prove Article III standing to sue, the plaintiff must establish that (1) he suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.  Spokeo, 136 S. Ct. at 1547. In other words, the "irreducible constitutional minimum of standing" consists of three elements: injury in fact, causation, and redressability.  Pedro, 868 F.3d at 1279 (citing

Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992)).  Beyond the requirements of Article III, to have standing to assert a statutory cause of action, a plaintiff must also show that he falls within "the zone of interests protected by the law invoked." Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377, 1388 (2014).

Where, like here, the issue of standing is raised at the summary judgment stage, the plaintiff can no longer rest on "mere allegations," as he may on a motion to dismiss.  Bischhoff v. Osceola County, Fla., 222 F.3d 874, 878 (11th Cir. 2000) (citing Lujan, 504 U.S. at 561)).  Instead, the plaintiff must "'set forth' by affidavit or other evidence 'specific facts,' . . . which for purposes of the summary judgment motion will be taken to be true."  Id. (citing Lujan, 504 U.S. at 561; Wilson v. State Bar of Georgia, 132 F.3d 1422, 1427 (11th Cir.1998); Church v. Huntsville, 30 F.3d 1332, 1336 (11th Cir. 1994); Region 8 Forest Serv. Timber Purchasers Council v. Alcock, 993 F.2d 800, 806 (11th Cir. 1993)).  In assessing standing, the Court assumes that the plaintiff will prevail on the merits of his claim.  Peacock v. District of Columbia, 682 F.3d 77, 82 (D.C. Cir. 2012).

In the three years since Spokeo was decided, the Eleventh Circuit has repeatedly addressed the issue of standing in the context of consumer protection statutes, such as the FCRA, the Fair Debt Collection Practices Act ("FDCPA"), and the Fair and Accurate Credit Transactions Act ("FACTA").  In those cases, the Court (1) has

expressly acknowledged Congress's ability to create statutory rights that, when violated, result in concrete injuries sufficient to confer standing, and (2) has been unwilling to substitute its judgment for Congress's by finding that a violation of the law is not sufficiently concrete to confer standing.  See, e.g., Church v. Accretive Health, Inc., 654 F. App'x 990 (11th Cir. 2016) (unpublished) (holding that the plaintiff suffered a concrete informational injury sufficient to confer standing when she was denied certain disclosures required by the FDCPA); Muransky v. Godiva Chocolatier, Inc., 922 F.3d 1175 (11th Cir. Apr. 2019) (holding that the plaintiff had standing to assert claims under FACTA when a retailer issued the plaintiff a credit card receipt that was not truncated in accordance with the statutory requirements) (rehearing en banc granted, opinion vacated by Muransky v. Godiva Chocolatier, Inc., 939 F.3d 1278 (11th Cir. Oct. 2019)).

"An injury sufficient for standing purposes is 'an invasion of a legally protected interest which is[:] (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'"  Pedro, 868 F.3d at 1279 (citing Common Cause/Ga., 554 F.3d at 1350 (quoting Lujan, 504 U.S. at 560)).   Under Spokeo, a concrete injury "must actually exist," meaning it must be "real and not abstract."  Spokeo, 136 S. Ct. at 1548 (citations and internal quotation marks omitted).  However, an injury need not be "tangible" to be concrete.  Id. at 1549.  With respect to concrete injuries that are

intangible, the Supreme Court stated that "Congress is well-positioned to identify intangible harms that meet minimum Article III requirements" and that "'Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before.'" Id. (quoting Lujan, 504 U.S. at 580).

Plaintiff alleges that he suffered an injury from the unauthorized disclosure of his NCTUE credit data to Equifax, without a permissible purpose, which is specifically prohibited by the FCRA. See 15 U.S.C. §§ 1681b(a), (f). The violation of a statute does not automatically satisfy the injury-in-fact requirement "whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." Spokeo, 136 S. Ct. at 1549. Although such a violation may, "in some circumstances," be sufficient to establish an injury in fact, a plaintiff cannot "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." Id. For example, the Spokeo Court noted that a claim under the FCRA that the issuance of a credit report that wrongfully contained false information likely would not establish a concrete injury if the allegedly false information was merely an incorrect zip code. Id. at 1550. Rather, Article III standing based on a statutory cause of action depends on the nature of the statute and the alleged harm in question.

In examining whether a statutory violation constitutes an injury in fact, a court must consider whether the violation resulted in "the type of harm Congress sought to prevent. . . ." Dreher v. Experian Info. Sols., Inc., 856 F.3d 337, 345–46 (4th Cir. 2017); see also Robins v. Spokeo, Inc., 867 F.3d 1108, 1113 (9th Cir. 2017) (stating that in assessing whether a statutory violation results in an injury in fact, courts must consider "whether the statutory provisions at issue were established to protect plaintiff's concrete interests" and "whether the specific procedural violations alleged in this case actually harm, or present a material risk of harm, to such interests").

Congress enacted the FCRA in 1970 "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." Safeco Ins. Co. of America v. Burr, 551 U.S. 47, 52 (2007); accord Spokeo v. Robins, 136 S. Ct. at 1545 (quoting 15 U.S.C. § 1681(a)(1)). The FCRA applies to companies, including CRAs like Equifax and NCTUE, "that regularly disseminate information bearing on an individual's 'credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living.'" Spokeo, 136 S. Ct. at 1545 (quoting Section 1681a(d)(1)). In enacting the FCRA, Congress expressly found that "[t]here is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the

consumer's right to privacy."  15 U.S.C. § 1681(a)(4).  Thus, protecting consumer privacy was a foundational goal of the FCRA.

To protect consumers' privacy rights, Congress structured the FCRA to include an elaborate set of interlocking provisions that restrict the access to and dissemination of consumer reports.  See, e.g., 15 U.S.C. § 1681b(a) (permissible purpose); 15 U.S.C. § 1681e(a) (certification of permissible purpose); 15 U.S.C. § 1681b(f) (user's certification of permissible purpose).   The FCRA provides that "[a]ny person who willfully fails to comply with any requirement [of the FCRA] with respect to any [individual] is liable to that [individual]" for, among other things, either "actual damages" or statutory damages of $100 to $1,000 per violation, costs of the action, attorney's fees, and possibly punitive damages.  Id. (citing Section 1681n(a)).

The FCRA's restrictions on access to and disclosure of credit reports address privacy interests that have traditionally been protected by the law.  Robins v. Spokeo, Inc., 867 F.3d 1108, 1114–15 (9th Cir. 2017).   Indeed, "unauthorized disclosures of information have long been seen as injurious."  In re Horizon Healthcare Servs. Inc. Data Breach Litig., 846 F.3d 625, 638 (3d Cir. 2017) (quoting In re Nickelodeon Consumer Privacy Litig., 827 F.3d 262, 272–74 (3d Cir. 2016) (internal quotation marks and emphasis omitted).  The Court therefore finds that the FCRA's limitations on the furnishing and disclosure of credit reports are designed to protect a consumer's

concrete interest in the privacy of those reports.

Since Spokeo, several courts, including this one, have concluded that the FCRA created a substantive right to privacy protecting individuals against disclosure of their credit-related information except for the limited permissible purposes enumerated by the statute. See Ruk v. Crown Asset Mgmt., LLC, No. 1:16-cv-344-LMM-JSA, 2017 WL 3085282, at *4 (N.D. Ga. Mar. 22, 2017); Burke v. Fed. Nat'l Mortg. Assoc., No. 3:16-cv-153, 2016 WL 4249496, at *4 (E.D. Va. Aug. 9, 2016)).  These and other courts from within this Circuit and elsewhere "have similarly opined . . . that individuals have standing to sue for the impermissible disclosure of their credit information," reasoning that the FCRA creates a substantive right to privacy with regard to access to an individual's sensitive credit information, the violation of which is not merely a "bare procedural violation."  Ruk, 2017 WL 3085282, at *4 (citations omitted).

Plaintiff argues that the evidence of record demonstrates that Defendants violated Plaintiff's substantive right to privacy with respect to the information in his NCTUE credit file.  Specifically, Plaintiff asserts that between June 25, 2014 and March 23, 2018, NCTUE provided, and Equifax obtained, data from Plaintiff's NCTUE credit file at least 185 times, as evidenced by the inquiries listed on Plaintiff's NCTUE credit file disclosures.  [Doc. 62 at 10 (citing Willis Dep. at 30–31, 43–44,

49, and Exs. 51 [Doc. 50-7], 52 [Doc. 50-8], and 41 [Doc. 50-2])].  Plaintiff argues—and Equifax admits—that the data that Equifax obtained was confidential credit data that included Plaintiff's account payment history, the number of accounts in his name, the type of accounts that he held, his credit available, his credit used, and the length of his credit history.  [Id.].  Plaintiff avers that he never authorized Equifax to access his NCTUE credit file or to obtain that data.  [Pl.'s Decl. ¶ 9].  In analyzing the FCRA's enumerated "permissible purposes" for providing confidential credit data, Plaintiff asserts that NCTUE did not have a permissible purpose to provide Plaintiff's data to Equifax, and Equifax did not have a permissible purpose to obtain Plaintiff's data from NCTUE because: (1) Equifax is not a member of NCTUE; (2) NCTUE did not provide Plaintiff's data to Equifax in response to a court order or subpoena issued in connection with proceedings before a federal grand jury; (3) NCTUE did not provide Plaintiff's data in response to written instructions from Plaintiff; (4) NCTUE had no reason to believe that Equifax intended to use Plaintiff's  NCTUE data in connection with a credit transaction because Plaintiff has never applied for credit with Equifax; and (5) NCTUE had no reason to believe that Equifax intended to use Plaintiff's NCTUE credit data for employment, insurance, or licensing purposes.  [Doc. 62 at 3, 10, 24-25]; see 15 U.S.C. § 1681b(a)(1)–(3) (listing permissible purposes).  Nevertheless, it is undisputed that each time Equifax ACIS operators

34

accessed Plaintiff's Equifax credit file, the access and automatic calculation of an Insight Score (utilizing data from Plaintiff's NCTUE's credit file) showed up as an inquiry on Plaintiff's NCTUE credit report.

In the absence of any controlling authority on this question, the Court favors the reasoning of Ruk and the other cases that uphold a consumer's standing to sue for impermissible access to his or her credit report.[6] Looking to the judgment of Congress "in terms of the nature of the right and [alleged violation at issue], as courts have recognized and as the statute expressly states, "the FCRA reflects a clear intent to protect individuals' rights to privacy in their sensitive credit-related information." Ruk, 2017 WL 3085282, at *5. "It has long been the case that an unauthorized dissemination of one's personal information, even without a showing of actual damages, is an invasion of one's privacy that constitutes a concrete injury sufficient to confer standing to sue." See Thomas v. FTS USA, LLC, 193 F. Supp. 3d 623, 636 (E.D. Va. 2016) (citing Samuel D. Warren & Louis D. Brandeis, The Right to Privacy, 4 Harv. L. Rev. 193 (1890)). "Invasion of privacy is a 'harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts,' and

_____

[6] I note that the district court in Ruk was analyzing a motion to dismiss, but I find that distinction unimportant here. Plaintiff has come forward with actual evidence to support the allegations in the complaint regarding Equifax obtaining his confidential credit data without a lawful purpose.

thus may constitute a legally cognizable injury." Albu v. Home Depot, Inc., Nos. 1:15-cv-00412-ELR-JFK, 1:15-cv-03733-ELR-JFK, 2016 WL 11544404, at *13 (N.D. Ga. Nov. 2, 2016).

Courts have held that where a defendant fails to comply with statutory prerequisites protecting the plaintiff's privacy, the plaintiff's privacy has been unlawfully invaded and he has suffered concrete injury, regardless of actual damages. See, e.g., Thomas, 193 F. Supp. 3d at 636 (citing In re Nickelodeon Consumer Privacy Litig., 827 F.3d 262, 2016 WL 3513782, at *7 (3d Cir. 2016) (noting that "Congress has long provided plaintiffs with the right to seek redress for unauthorized disclosures of information that, in Congress's judgment, ought to remain private") (footnote omitted); Sterk v. Redbox Automated Retail, LLC, 770 F.3d 618, 623 (7th Cir. 2014) (holding that the plaintiffs suffered a concrete injury-in-fact when the defendant sold plaintiffs' information to third parties in violation of the Video Privacy Protection Act); Boelter v. Hearst Commc'ns, Inc., 192 F. Supp. 3d 427, 436–38, 2016 WL 3369541, at *3 (S.D.N.Y. June 17, 2016) (same); Johnson v. Navient Sols., Inc., 150 F. Supp. 3d 1005, 1006 (S.D. Ind. 2015) (ruling that the plaintiff had standing based on a violation of the plaintiff's statutory right to privacy created by the Telephone Consumer Protection Act); United States v. Koranki, No. CR–10–43–D, 2015 WL 4394947, at *1 (W.D. Okla. July 16, 2015) (finding that the government's failure to

36

follow necessary procedures before procuring bank customer's financial records invaded the customer's statutory right to privacy under the Right to Financial Privacy Act of 1978, which conferred standing); Cousineau v. Microsoft Corp., 992 F. Supp. 2d 1116, 1122–23 (W.D. Wash. 2012) (finding an invasion of privacy sufficient to constitute injury-in-fact where the defendant collected a smartphone user's location data without her consent)).

Defendants contend that Plaintiff did not suffer a concrete injury in fact sufficient to confer standing because at most, this case involved a "consumer reporting agency to consumer reporting agency exchange" of Plaintiff's information that did not harm Plaintiff in any way.  [Doc. 64 at 4].  Defendants cite to an out-of-circuit case, Harmon v. RapidCourt, LLC, No. CV 17-5688, 2018 WL 6062355, at *5 (E.D. Pa. Nov. 20, 2018) to support their claim that such an intra-CRA exchange of information is harmless to a consumer.  Harmon, however, is distinguishable, and Defendants' reliance on Harmon is misplaced.

In Harmon, the plaintiff alleged that he was harmed by the inclusion of state criminal charges in a consumer report, in violation of a different provision of the FCRA than the provisions at issue in this case.  Id. at *1.  The plaintiff specifically alleged that when he applied for a job with Uber, Uber contracted with Checkr, a CRA, for a consumer report on the plaintiff as part of the employment screening

37

process.  Checkr, in turn, contracted with RapidCourt for the plaintiff's criminal history.  Id.  The plaintiff alleged that both RapidCourt and Checkr were CRAs, and that the information transmitted from RapidCourt to Checkr was a "consumer report" as defined in the FCRA.  The plaintiff alleged that the criminal background information that RapidCourt provided to Checkr "included criminal charges older than seven years that did not result in any convictions," in violation of 15 U.S.C. § 1681c(a).  The plaintiff alleged that, by sharing this information, RapidCourt violated Section 1681e by failing to maintain accuracy in his consumer report.  Id.  The plaintiff alleged that he suffered several distinct harms from the defendant's failure to maintain an accurate consumer report, including embarrassment, frustration, fear of future reports to other future employers containing the same information, and hardship based on his efforts to clear his file.  The plaintiff, however, acknowledged that the information contained in the alleged disclosure ultimately did not prevent him from obtaining employment with Uber.  Id.  RapidCourt moved to dismiss the complaint on standing grounds because "the disclosure of information to another consumer reporting agency, without more, does not constitute a concrete harm."  Id. at *4.

The Harmon court determined, under the circumstances identified in Section 1681c(b), that otherwise obsolete criminal record data can be included in consumer

38

reports, and thus the defendant was properly in possession of the allegedly obsolete data, and the plaintiff's alleged embarrassment and other purported harms could not constitute a concrete injury.  The court stated that, under the particular facts of that case, the court was "unwilling to find that the transmission of allegedly prohibited information from one consumer reporting agency to another is a concrete injury that is real and not abstract."  Id. at *5.

The Pennsylvania court's ruling in Harmon is inapposite and of little to no value in determining standing in this case.  First, Harmon was an employment case, not a privacy case, and it was decided on a motion to dismiss.  The plaintiff in Harmon did not allege a violation of his right to privacy, or a violation of the permissible purpose provision(s) of the FCRA, both of which have been accepted as cognizable injuries for Article III standing purposes.  Rather, Harmon involved obsolete criminal charges and a different provision of the FCRA that have no bearing on the case before this Court.  Moreover, the FCRA provision at issue in this case unequivocally provides that a CRA may furnish a consumer report only under the listed circumstances, "and no other."  15 U.S.C. § 1681b(a); see also Ruk, 2017 WL 3085282, at *8 (stating that Section 1681b(a)(3) provides an "exclusive list" of purposes for which a consumer report may be furnished).  When crafting the "permissible purpose rule," Congress could have made an exception for CRA-to-CRA

transfers—i.e., allowing one CRA to provide a consumer report to another CRA without a permissible purpose[7]—but it did not do so.

Here, Plaintiff has alleged and presented credible evidence showing an actual unauthorized disclosure of at least some of his NCTUE credit information to Equifax, This disclosure amounts to an invasion of privacy, which is the type of injury that Congress sought to protect through the FCRA. Accordingly, I find that Plaintiff has established standing to assert his claims.

## 2. Plaintiff's Claims

The FCRA generally prohibits a person from using or obtaining a consumer report without a permissible purpose. 15 U.S.C. §§ 1681b(a), (f). In Count One of Plaintiff's Complaint, Plaintiff alleges that Defendants negligently or, in the alternative, willfully violated Section 1681b(a) of the FCRA by providing Plaintiff's NCTUE consumer reports to Equifax without a permissible purpose on multiple dates

---

[7] Congress, however, did exempt some such transfers from the definition of the term "consumer report" and the reach of the FCRA, including "communication of . . . information among persons related by common ownership or affiliated by corporate control." 15 U.S.C. § 1681a(d)(2)(A)(iii). But Defendants have cited no case law or statutory provision indicating that Congress has ever provided a similar exemption for CRA-to-CRA transfers of data such as the transmittal of information at issue in this case.

subsequent to September 1, 2015.[8]  [Compl. ¶¶ 26–27].  Section 1681b(a) applies to CRAs and restricts the furnishing of a consumer report to the permissible purposes set forth in the statute, "and no other."  Based on the statutory language, to establish a claim under Section 1681b(a), a plaintiff must prove that (1) a "consumer reporting agency," (2) furnished the plaintiff's "consumer report" (3) to "a person" (4) that the CRA did not have reason to believe intended to use the information for a permissible purpose.

In Count Two, Plaintiff alleges that NCTUE negligently or, in the alternative, willfully violated Section 1681e(a) by failing to maintain reasonable procedures designed to avoid violations of Section 1681b(a).  [Compl. at 9].  The FCRA restricts the furnishing of a "consumer report" by a CRA "to a person which [the CRA] has reason to believe" has a permissible purpose for using or obtaining it.  15 U.S.C. § 1681b(a)(3).  The FCRA requires CRAs to "maintain reasonable procedures to limit the furnishing of consumer reports to the purposes listed under [Section 1681b]," and those procedures include "requiring prospective users of the information to identify

---

[8]  Plaintiff brings Count One against both Defendants, under Section 1681b(a). Because this code section addresses the provision of consumer reports, it appears that it applies, if at all, to NCTUE, not Equifax, because NCTUE is the party that is alleged to have provided Plaintiff's information to Equifax.  It is possible that Plaintiff is also contending that Equifax, as a NCTUE vendor, provided the information to itself. Neither party has addressed this issue, however, and it is not necessary that the Court address it now.

themselves, certify the purposes for which the information is sought, and certify that the information will be used for no other purpose." Dobson v. Holloway, 828 F. Supp. 975, 977 (M.D. Ga. 1993) (internal quotation marks and citation omitted). Plaintiff alleges that as a result of failing to maintain reasonable procedures, NCTUE provided Plaintiff's NCTUE data or "consumer report" to Equifax without a permissible purpose on no less than 90 occasions. [Id.].

In Count Three, Plaintiff alleges that Equifax negligently or, in the alternative, willfully violated Section 1681b(f) by repeatedly obtaining Plaintiff's NCTUE consumer reports from NCTUE without a permissible purpose on multiple dates subsequent to September 1, 2015. [Compl. ¶ 37]. Section 1681b(f) prohibits "a person" from using or obtaining a consumer report "for any purpose unless":

> (1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section; and

> (2) the purpose is certified in accordance with section 1681e of this title by a prospective user of the report through a general or specific certification.

15 U.S.C. § 1681b(f). To prevail on a claim under Section 1681b(f), a plaintiff must prove that: (1) there was a consumer report; (2) the defendant obtained it; (3) the

defendant did so without a permissible statutory purpose; and (4) the defendant acted with the specified culpable mental state.  Hill v. Ocwen Loan Servicing, LLC, 369 F. Supp. 3d 1324, 1340 (N.D. Ga. 2019) (citing Davis v. Capital One Auto Fin., No. 1:17-cv-1706-WSD, 2017 WL 4129647, at *2 (N.D. Ga. Sept. 18, 2017)).

### a.   Was the Information a "Consumer Report"?

Plaintiff's lawsuit fails if the NCTUE information or data at issue in this case was not a "consumer report," as defined in the FCRA.  In their motion for summary judgment, Defendants repeatedly argue that the NCTUE information at issue in this case is not a "consumer report" as defined in the FCRA, and therefore they did not violate the FCRA.  Defendants insist that they are entitled to summary judgment on all of Plaintiff's claims because Equifax never accessed Plaintiff's *entire* NCTUE "consumer report"; rather, only certain "data attributes" from Plaintiff's NCTUE file (but not the entire file) were utilized to generate the Insight Score.  Thus, Defendants unequivocally deny that NCTUE ever provided and Equifax ever received a consumer report, as defined in the FCRA, concerning Plaintiff.  Moreover, Defendants assert that the inquiries at issue here occurred only when Equifax operators viewed Plaintiff's Equifax file, not his NCTUE file, and the only thing the operators saw that involved the NCTUE information was a three-digit score; the operators never had access to Plaintiff's NCTUE file and did not see any accounts or other information

43

contained in his NCTUE file.  [Doc. 53-1 at 10].  Defendants argue that because the

information that Equifax obtained from NCTUE was not a consumer report, Plaintiff

cannot establish standing because he did not suffer "the type of harm (an invasion of

privacy) the permissible purpose provisions of the FCRA intend to prevent."  [Doc.

53-1 at 3].  Additionally, if the NCTUE information is not a "consumer report," then

Plaintiff's claims in all three counts fail as a matter of law because each alleged

violation requires Plaintiff to show misconduct related to a "consumer report."

The FCRA defines the term "consumer report" as:

> *any* written, oral, or other communication of *any*
> information by a consumer reporting agency bearing on a
> consumer's credit worthiness, credit standing, credit
> capacity, character, general reputation, personal
> characteristics, or mode of living which is used or expected
> to be used or collected in whole or in part for the purpose
> of serving as a factor in establishing the consumer's
> eligibility for—
>
> (A) credit or insurance to be used primarily for personal,
> family, or household purposes;
>
> (B) employment purposes; or
>
> (C) any other purpose authorized under section 1681b of
> this title.

15 U.S.C. § 1681a(d)(1) (italics added).

As defined in 15 U.S.C. § 1681a(d) and as construed by the Eleventh Circuit, a "consumer report," under the FCRA, is made up of "three fundamental elements." Yang v. Government Employees Ins. Co., 146 F.3d 1320, 1323 (11th Cir. 1998). "First, a 'consumer reporting agency' must 'communicat[e] . . . information[.]'" Id. Plaintiff refers to this element as "the creator requirement." [Doc. 62 at 12]. "Second, the 'communication of information' must 'bear[ ] on' any one of a list of factors" set forth in the statute, including a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living. Yang, 146 F.3d at 1323. Plaintiff refers to this second element as "the content requirement." [Doc. 62 at 12]. "Third, the 'communication of information' must be 'used or expected to be used or collected in whole or in part'" for any one of the permissible purposes listed in 15 U.S.C. § 1681b. Id. The third element is referred to as the "purpose clause," see Yang, 146 F.3d at 1323, or "purpose requirement" [Doc. 62 at 12].

Here, the first two elements are easily met. Defendants admit that NCTUE is a "consumer reporting agency" under the FCRA [Doc. 48-5 ¶ 2; Doc. 48-4 ¶ 2; DSMF ¶ 6], and that NCTUE's database contains information on more than 200 million U.S. consumers, including Plaintiff. [DSMF ¶ 5]. It is undisputed that NCTUE (or

Equifax, in NCTUE's shoes) communicated some of Plaintiff's information that NCTUE had collected to Equifax.  The first element is satisfied.

As for the second element ("content"),  Defendants admit that the information Equifax obtained from Plaintiff's NCTUE credit file and used to create the Insight Score included Plaintiff's account payment history, the number of accounts in his name, the type of accounts that he held, his credit available, his credit used, and the length of his credit history.  [Doc. 48-7 at 4, Resp. to Interrog. No. 3].  It is beyond dispute that such information "bears on" several (if not all) of the seven enumerated factors, including Plaintiff's credit standing, credit capacity, character, and reputation. This element is also satisfied.

The third element—the purpose requirement—is also met.  It is undisputed that the data that NCTUE provided (and Equifax obtained) regarding Plaintiff was "collected" by NCTUE for a permissible purpose, under the FCRA.  Specifically, the undisputed evidence shows that NCTUE collected the credit data in Plaintiff's NCTUE file so that the information could be sold to its members for credit purposes in the form of "data reports" or "consumer reports."  [Doc. 48-5 ¶¶ 14–17; Doc. 48-3 ¶¶ 9–10; 15 U.S.C. § 1681b(a)(3)(A)].  As such, the NCTUE information at issue in this case is a "consumer report."   See Yang, 146 F.3d at 1324 (concluding that due to the purpose clause's "repetitive use of the disjunctive 'or,'" the information at issue

46

is a "consumer report" if such a finding is consistent with any one of the clause's components: ultimate use, expectation of use, or reason for compilation).

In their motion for summary judgment, Defendants argue that the information Equifax obtained from NCTUE was not a consumer report because the NCTUE data was not provided to Equifax for use in determining Plaintiff's eligibility for credit, employment, or insurance,  This argument, however, ignores Yang's holding that information is a "consumer report" if it was ultimately used, expected to be used, or collected in whole or in part for a "permissible purpose."  Yang, 146 F.3d at 1324. While "ultimate use" is one of the ways information becomes a "consumer report" under the FCRA, it is not the only way.  Defendants' argument or approach was soundly rejected by both the Eleventh Circuit in Yang and by the Fifth Circuit in St. Paul Guardian Ins. Co. v. Johnson, 884 F.2d 881, 884 (5th Cir. 1989), which was cited and relied upon by the Eleventh Circuit in deciding Yang.

In Johnson, an insurance company obtained a credit report on a consumer as part of investigating a potentially fraudulent insurance claim.  Johnson, 884 F.2d at 882.  The consumer alleged that the insurer violated the FCRA by doing so.  Id. In response, the insurer contended, as Defendants do here, that because the insurer did not "use" the information contained in the consumer's credit report for any of the enumerated purposes in Section 1681a(d), the credit report was not a "consumer

report" within the meaning of the FCRA.  Id. at 883.  The Fifth Circuit rejected the

insurer's argument, holding that the purpose requirement of the definition of

"consumer report" was satisfied because the information in the credit report was

"collected" for a permissible purpose, and "the purpose for which the information

was collected governs whether [a] report is a 'consumer report' under the FCRA,"

notwithstanding how the information might ultimately be used.  Id. at 884–85.  The

Fifth Circuit noted the absurd results of adopting the insurer's construction of the term

"consumer report":

> To illustrate the untenable nature of St. Paul's construction
> of the FCRA in this context, suppose X secured Y's credit
> report for the sole purpose of disclosing it to embarrass Y.
> Under St. Paul's reasoning, focusing solely on X's "use" of
> the report, the report would not be a credit report under the
> FCRA and thus Y would not be afforded FCRA
> protections.  Not only would this result run contrary to
> congressional intent, it would render meaningless FCRA
> section 1681b which allows for the release of credit reports
> only for certain purposes.

Id. at 884.

The reasoning of the Fifth Circuit in Johnson is equally applicable to this case.

The "purpose" element of the "consumer report" definition is met not because of what

Equifax did with the information, but because of NCTUE's reason for collecting the

information in the first place.  It is undisputed that NCTUE collected Plaintiff's credit

information in order to sell it to its members for credit purposes, and also that was the expected use. 15 U.S.C. § 1681a(d)(1)(A). Thus, the information transmitted by NCTUE to Equifax (and accessed by Equifax) is a protected "consumer report" because NCTUE compiled it for credit-related purposes and expected it to be used for such purposes. See Yang, 146 F.3d at 1325.

After careful review, I conclude that Defendants have urged this Court to read the definition of "consumer report" under the FCRA too narrowly. Courts in this circuit have held that "[t]he definition of consumer or credit report under the FCRA is broad, encompassing *any* oral or written communication by the credit reporting agency bearing on the consumer's credit worthiness, credit standing, or credit capacity." See, e.g., Lee v. Security Check, LLC, No. 3:09-cv-421-J-12TEM, 2010 WL 3075673, at *10 (M.D. Fla. Aug. 5, 2010) (italics added). By arguing that Equifax's conduct is excused because it accessed only a portion of NCTUE's data, Defendants would have this Court insert the words "complete file" or "all information" into the statutory definition, which this Court will not do. Defendants admit that the information Equifax obtained from Plaintiff's NCTUE credit file included his account payment history, the number of accounts in his name, the type of accounts that he held, his available credit, his credit used, and the length of his credit history. This type of data unquestionably has a "bearing" on Plaintiff's credit

49

worthiness, credit standing, and/or credit capacity, and was admittedly utilized in conjunction with Equifax's own data to generate a credit risk score, which presumably reflected Equifax's assessment of Plaintiff's credit worthiness and/or credit standing. The fact that specific Equifax operators were not able to view any of the underlying NCTUE data that went into creating the Insight Scores does not alter the fact that Equifax obtained proprietary credit data from Plaintiff's NCTUE credit file and used it, in combination with Equifax's own credit data, to generate a credit risk score as a product to be offered for sale by Equifax to the consumer and possibly to third party subscribers.

Defendants also argue that they did nothing wrong because the Insight Scores were not "distributed to a third party for the purposes of determining a consumer's eligibility for credit, insurance, or employment," but this ignores the fact that Equifax is a distinct and separate corporate entity from NCTUE; thus, the NCTUE data was distributed to a third party, i.e., Equifax.  It is undisputed that Equifax does not own any interest in NCTUE, and NCTUE does not own any interest in Equifax.  Rather, the consumer credit data in NCTUE's database is owned by NCTUE's members, which are companies in the telecommunications, pay TV, and utilities industries, such as AT&T, DirecTV, and Georgia Power.  According to the evidence presented, Equifax is not a member of NCTUE and does not own any of the data in NCTUE's

consumer credit files.  While it is true that at all relevant times, Equifax served as a vendor providing database services to NCTUE, it is also true that when Equifax accessed the data in Plaintiff's NCTUE credit file to generate its Insight Score, Equifax was not acting as a "vendor" or providing services to NCTUE with respect to Plaintiff's NCTUE credit file.  Rather, Equifax accessed Plaintiff's NCTUE credit file in the process of handling disputes that Plaintiff had made concerning information *in his Equifax credit file*, not his NCTUE credit file.  In short, the evidence of record shows that Equifax used its vendor status to access the data in Plaintiff's NCTUE credit file for its own purposes, which may arguably have been permitted under Equifax's Contract with NCTUE, but were not permissible purposes under the FCRA. And Equifax appears to have done so with NCTUE's implicit, if not actual, knowledge and consent, thereby violating Plaintiff's substantive right to privacy.  I am not persuaded that Defendants' private contractual arrangement with each other can alter the application of federal law, absent a statutory provision allowing the Defendants' rather unique business arrangement.  See Cortez v. Trans Union LLC, 617 F.3d 688, 708 (3d Cir. 2010).  I do not believe that Congress intended to allow CRAs to freely share their proprietary information with each other and to escape the "permissible purposes" requirement in Section 1681b(a) by simply contracting with

a third party to store and maintain information that would otherwise clearly be part of the consumer's file and included in a credit report.   See id. at 711.

### b.   Count One

As set forth earlier, Section 1681b(a) applies to CRAs and restricts the furnishing of a consumer report to the permissible purposes set forth in the statute, "and no other."  To establish a claim under Section 1681b(a), a plaintiff must prove that (1) a "consumer reporting agency," (2) furnished the plaintiff's "consumer report" (3) to "a person" (4) that the CRA did not have reason to believe intended to use the information for a permissible purpose.

The first three elements of Plaintiff's claim in Count One for violation of Section 1681b(a) are easily satisfied.  All parties admit that NCTUE and Equifax are CRAs.  The data that NCTUE provided to Equifax (or that Equifax, in its role as NCTUE's vendor, provided to itself pursuant to its access to NCTUE's database) was a "consumer report" under the FCRA, and the data was provided to "a person," namely Equifax, as part of the process to generate Insight credit risk scores, which Equifax viewed and offered for sale.

As to the fourth element (i.e., whether the CRA that furnished the information had reason to believe the person to whom the information was furnished intended to use the information for a permissible purpose), there is a genuine material fact dispute

as to whether, and if so, when NCTUE had actual knowledge that Equifax was accessing NCTUE credit files when reinvestigating Equifax consumer disputes, which is not a permissible purpose under the FCRA.  Plaintiff has submitted evidence suggesting that the Contract by and between NCTUE and Equifax limited the incorporation of NCTUE data, "or portions thereof," into Equifax's "score and scoring model products to assess risk" only to the specified "Authorized Uses," which required "a permissible purpose pursuant to the FCRA" and written notice in advance to NCTUE.  [Doc. 50-4 at 7–9, ¶¶ 2.15, 2.15(e) & (f)].  In addition to the Contract, Plaintiff points to the deposition testimony of NCTUE's Alan Moore that he knew as early as the summer of 2016 that Equifax was accessing NCTUE credit files when reinvestigating Plaintiff's Equifax consumer disputes.  Plaintiff has also relied on his exchange of emails with King & Spalding attorney Meryl Roper to support his claim that both NCTUE and Equifax had actual knowledge in or before mid 2016 that the NCTUE database and Equifax's dispute resolution system were linked together, causing "inquiries to show up on the NCTUE report."  [Pl.'s Decl. ¶ 12 & Ex. 2].  Of course, both Mr. Moore and Ms. Roper have recently submitted affidavits changing their statements.

Plaintiff also points to evidence showing that, whatever the date was, as soon as Mr. Moore learned that an inquiry on Plaintiff's NCTUE credit file was recorded

every time Plaintiff's NCTUE credit file was accessed by Equifax's ACIS system in the process of reinvestigating Plaintiff's Equifax consumer disputes, Mr. Moore directed NCTUE's outside counsel to instruct Equifax to stop the practice that was causing inquiries on Plaintiff's NCTUE file. [Moore Dep. at 36]. Based on the evidence currently before this Court, a reasonable jury could find that NCTUE and/or Equifax provided Plaintiff's NCTUE credit information to Equifax without reason to believe that the information would be used for a statutory permissible purpose under the FCRA. Accordingly, the Court cannot conclude as a matter of law that no violation of Section 1681b(a) occurred.

For the reasons stated, I RECOMMEND that Defendants' motion for summary judgment as to Plaintiff's Count One claim for violation of Section 1681b(a) be DENIED.

### c. Count Two

In Count Two of Plaintiff's Complaint, Plaintiff alleges that NCTUE negligently or, in the alternative, willfully violated Section 1681e(a) by failing to maintain reasonable procedures designed to avoid violations of Section 1681b(a). [Compl. at 9]. Plaintiff alleges that as a result, NCTUE provided Plaintiff's NCTUE data or consumer reports to Equifax without a permissible purpose on no less than 90 occasions. [Id.].

54

In response, Defendants argue that even if the NCTUE data used to calculate the Insight Scores is determined to be a consumer report, NCTUE is still entitled to summary judgment because it had reason to believe that Equifax would handle the NCTUE data in accordance with the FCRA.  [Doc. 53-1 at 21].  As discussed briefly above, the FCRA provides that a CRA may furnish a consumer report "to a person which it has reason to believe" has a permissible purpose for using or obtaining it.  15 U.S.C. § 1681b(a)(3).  The FCRA requires CRAs to "maintain reasonable procedures to limit the furnishing of consumer reports to the purposes listed under [Section 1681b]," and those procedures include "requiring prospective users of the information to identify themselves, certify the purposes for which the information is sought, and certify that the information will be used for no other purpose."  Dobson v. Holloway, 828 F. Supp. 975, 977 (M.D. Ga. 1993) (internal quote marks and citation omitted).

In its brief, NCTUE argues that it has had a longstanding relationship with Equifax and a Contract whereby Equifax agreed to comply with the FCRA in its handling of NCTUE's data.  NCTUE argues that the evidence shows, as a matter of law, that it followed reasonable procedures to prevent the disclosure of consumer reports for improper purposes and that it is entitled to summary judgment on Count Two of the Complaint.  [Doc. 53-1 at 21–23].  In support of this argument, NCTUE cites to evidence tending to show that it relied on Equifax to comply with the law and

that it was not aware of what Equifax was doing.  NCTUE contends that it had no knowledge of any prior situations in which Equifax provided NCTUE's data to third parties that lacked a permissible purpose, that NCTUE conducted regular audits of Equifax to make sure that Equifax was in compliance with the terms of the Contract between the parties, and that NCTUE's executive director, Mr. Moore, was in weekly, and often daily, contact with Equifax concerning the operation of the NCTUE database.

On Defendants' motion for summary judgment, however, I am constrained to view the evidence in the light most favorable to the non-movant, who in this case is Plaintiff.[9]  When viewed in the light most favorable to Plaintiff, the evidence shows that NCTUE knowingly permitted its data to be "linked together" with that of Equifax, and did so without a discernible permissible purpose.  The evidence also shows that NCTUE's executive director and legal counsel knew about it and failed to act reasonably to prevent the practice from occurring or continuing.  In light of this evidence, I conclude that whether NCTUE followed reasonable procedures to prevent the disclosure of consumer reports for improper purposes is a question left for the jury.  See Smith v. E-Backgroundchecks.com, Inc., 81 F. Supp. 3d 1342, 1357 (N.D.

---

[9]  In his cross-motion for partial summary judgment, Plaintiff did not move for summary judgment on Count Two.

Ga. 2015) (noting that whether a CRA followed reasonable procedures will be a jury question in the overwhelming majority of cases).

According, I RECOMMEND that Defendants' motion for summary judgment on Plaintiff's Count Two claim against NCTUE be DENIED.

### d.    Count Three

In Count Three, Plaintiff alleges that Equifax violated Section 1681b(f), which prohibits "a person" from using or obtaining a consumer report for any purpose other than those specifically authorized under the statute.  As mentioned earlier, to prevail on a claim under Section 1681b(f), a plaintiff must prove that: (1) there was a consumer report; (2) the defendant obtained it; (3) the defendant did so without a permissible statutory purpose; and (4) the defendant acted with the specified culpable mental state.  Hill v. Ocwen Loan Servicing, LLC, 369 F. Supp. 3d 1324, 1340 (N.D. Ga. 2019).

As to Plaintiff's Section 1681b(f) claim, Defendants' motion for summary judgment relies on their repeated assertion that "the Insight Scores at issue were not consumer reports" and Equifax did not obtain a consumer report from NCTUE. [Doc. 53-1 at 16].  However, for the reasons discussed earlier, Plaintiff is not claiming and has not claimed that the Insight Scores are consumer reports.  Rather, Plaintiff contends, and has presented competent evidence to establish, that the consumer

reports at issue in this case consist of the credit data that Equifax obtained from Plaintiff's NCTUE credit file.  [Doc. 62 at 20].  Plaintiff has provided sufficient probative evidence showing that his NCTUE credit data was a "consumer report," that Equifax obtained it, that Equifax did so without a permissible statutory purpose under the FCRA, and that Equifax did so with the specified culpable mental state. Accordingly, Equifax is not entitled to summary judgment on Plaintiff's Count Three claim against Equifax for violation of Section 1681b(f).

For the reasons stated, I RECOMMEND that Defendants' motion for summary judgment as to Plaintiff's Count Three claim under Section 1681b(f) be DENIED.

### e.    Plaintiff's Emotional Distress Allegations

Defendants next argue that they are entitled to summary judgment on Plaintiff's claim(s) for emotional distress because Plaintiff's emotional distress and alleged fears that NCTUE was providing consumer reports to Equifax are at best speculative and based on factual misconceptions.[10]  [Doc. 53-1 at 14–15, citing cases]. According to Defendants, Plaintiff's deposition testimony shows that he has "self-diagnosed" his

---

[10] Defendants also raised the issue of Plaintiff's emotional distress allegations as part of their argument for why they contend Plaintiff lacks Article III standing.  However, having found that Plaintiff has Article III standing based on the alleged violations of Plaintiff's right to privacy with regard to access to his sensitive credit information, as conferred by the FCRA, I have limited my analysis to Defendants' arguments seeking summary judgment on Plaintiff's entitlement to emotional distress damages. [See Doc. 53-1 at 13].

emotional condition; he has never gone to a doctor about these issues, has not taken any medications or received any medical treatment, and no medical professional has told him that the issues were caused or exacerbated by Equifax or NCTUE. [Doc. 53-1 at 13]. Defendants point to Plaintiff's deposition testimony that his emotional distress originated from his "terrifying" belief that King & Spalding attorneys were spying on him to obtain information from his internet and telecommunications providers to examine such things as his entertainment choices. [Id. at 14, citing DSMF ¶ 68]. Defendants argue that Plaintiff's claim for emotional distress fails because it stems from his misconceptions regarding why Equifax attorneys were viewing his NCTUE consumer report. [Id.]. Defendants argue that Plaintiff's emotional distress is "imaginary" because he cannot show that NCTUE is providing his NCTUE consumer report to Equifax. Defendants argue that a case or controversy must be based on a real or immediate injury or threat of future injury that is caused by the defendants, "an objective standard that cannot be met by a purely subjective or speculative fear of future harm." [Id.]. But Plaintiff has not alleged concerns over future harm.

Instead, Plaintiff has alleged, argued, and provided evidence showing the circumstances surrounding his alleged injury and associated emotional distress, including:

- how Plaintiff discovered the alleged improper inquiries by Equifax on his NCTUE file disclosure report;

- the effect that discovery had on him;

- the efforts he undertook to uncover the reason(s) Equifax was accessing his NCTUE credit file;

- and the mental and emotional distress Plaintiff experienced—feeling that his privacy had been improperly invaded and worrying about other unauthorized invasions of his private credit information.

Paragraph 25 of Plaintiff's Complaint alleges that "[a]s a proximate result of NCTUE providing and Equifax obtaining [Plaintiff's] consumer reports without a permissible purpose, [Plaintiff] has suffered damages, to wit: (i) he has suffered an invasion of his right to privacy and (ii) he has suffered emotional distress, is anxious, and unable to focus on his work or sleep." [Compl. ¶ 25]. Plaintiff testified during his deposition that he was "damaged through emotional distress, [the] physical symptoms of it," including sleeplessness, inability to focus, lethargy, loss of energy, loss of interest in hobbies and things outside of work, and depression. [Pl.'s Dep. at 29–35; see also generally Doc. 62-1, Second Decl. of Glenn Heagerty ("Pl.'s Second Decl.")].

The Eleventh Circuit has recognized, without deciding, that a plaintiff seeking actual or compensatory damages under the FCRA might be entitled to recover compensation for emotional distress.  See Levine v. World Fin. Network, Nat'l Bank, 437 F.3d 1118, 1124 (11th Cir. 2006).  Other courts, cited by the Eleventh Circuit in Levine, have specifically so held, including this Court.  Black v. Asset Acceptance, LLC, No. 1:05-CV-1588-BBM, 2006 WL 8432147, at *5 (N.D. Ga. May 19, 2006) (listing cases); Moore v. Equifax Info. Servs., LLC, 333 F. Supp. 2d 1360, 1365 & n.3 (N.D. Ga. 2004) (concluding that damages for mental distress are recoverable under the FCRA even if the consumer has suffered no out-of-pocket losses).

For Defendants to win at the summary judgment stage on Plaintiff's claims, there cannot be fact issues as to any of the elements of Plaintiff's claims.  Here, Plaintiff has submitted his own testimony of emotional harm, which he alleges is due directly to Defendants' conduct.  See Smith v. E-Backgroundchecks.com, Inc., 81 F. Supp. 3d 1342, 1347 (N.D. Ga. 2015).  Plaintiff has also pointed to documentary evidence (the Roper email exchange) describing the emotional harm that he suffered upon learning that his NCTUE credit data was being accessed by Equifax without his knowledge or permission.  In response, Defendants have submitted the Roper Declaration in an attempt to show that Plaintiff has misconstrued the facts and lacks proof that he has suffered emotional distress damages.

Where, like here, the plaintiff "has provided his own testimony in support of his allegations," this Court has concluded that it "cannot say, as a matter of law, that Plaintiff is not entitled to recover damages for emotional distress," especially since "[i]n FCRA cases, a plaintiff is not required to produce evidence of emotional distress beyond his own testimony."  See id. at 1346–47 (citation omitted).  In this case, Plaintiff has provided evidence sufficient to create a question of fact for the jury.  Id. at 1347.  Accordingly, I RECOMMEND that Defendants' motion for summary judgment on Plaintiff's claim for emotional damages be DENIED.

### f.   Willfulness

Finally, Defendants argue that even if they do not prevail on their arguments regarding standing, "consumer report," and damages, they should be granted summary judgment on Plaintiff's claims for willful violations of the FCRA—claims that come with both statutory and punitive damages.[11]  15 U.S.C. § 1681n(a)(2).  "Willfully" means either knowingly or with reckless disregard.  See Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 58–59 (2007).

---

[11] Civil liability for negligent noncompliance with any requirement imposed under the FCRA is limited to actual damages sustained by the consumer as a result of the failure, and the costs of the action, together with reasonable attorney's fees as determined by the Court.  15 U.S.C. § 1681o(a).

To prove a claim for willful violation of the FCRA, a plaintiff must allege and establish that a CRA "either knowingly or recklessly violated the requirements of the [FCRA]." Levine v. World Fin. Network Nat'l Bank, 554 F.3d 1314, 1318 (11th Cir. 2008) (citing Safeco, 551 U.S. at 57–58).[12]  A CRA recklessly violates the FCRA when its actions are "not only a violation under a reasonable reading of the statute's terms, but [the plaintiff] shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." Id. (quoting Safeco, 551 U.S. at 69).  "Thus, even if a consumer reporting agency engages in an erroneous reading of the statute, it is not reckless unless [the reading] was objectively unreasonable." Smith v. HireRight Sols., Inc., 711 F. Supp. 2d 426, 434 (E.D. Pa. 2010) (citing Safeco).  To prove a reckless violation, a plaintiff must show that the defendant's interpretation was "'objectively unreasonable' under either the text of the Act or 'guidance from the courts of appeals or the Federal Trade Commission that might have warned [the agency] away from the view it took." Levine, 554 F.3d at 1318 (quoting Safeco, 551 U.S. at 68–69).

Generally, courts have allowed a willful noncompliance claim to proceed where a defendant's conduct involves willful misrepresentations or concealments.  See

---

[12]  In Safeco, the Supreme Court concluded that "knowing violations are sensibly understood as a more serious subcategory of willful [violations]." Safeco, 551 U.S. at 59–60.

Cousin v. TransUnion Corp., 246 F.3d 359, 372 (5th Cir. 2001) (citing Pinner v. Schmidt, 805 F.2d 1258, 1263 (5th Cir. 1986)).

Defendants acknowledge, as they must, that willfulness is typically a question of fact for the jury; yet they nevertheless argue that the Court should grant them summary judgment on each of Plaintiff's willfulness claims. [Doc. 53-1 at 23–24]. Defendants argue (again) that the NCTUE data used to calculate Plaintiff's Insight Score was never provided to any third parties, but only exchanged between NCTUE and Equifax, "the two entities that already had access to the data and were its stewards." [Doc. 53-1 at 24]. Defendants contend that there is no prior case law holding or regulatory finding that the NCTUE data used in this manner was a consumer report. Defendants further argue that Plaintiff was never at risk of being denied credit, employment, or insurance based on Equifax's generation of an Insight Score for Plaintiff.

At this stage of the proceedings, I must construe the facts in the light most favorable to Plaintiff. Viewed in this light, the evidence shows that proprietary credit data in Plaintiff's NCTUE credit file was provided to a third party, namely Equifax; that Equifax and NCTUE are distinct and separate corporate entities, with no ownership interest in the other's corporate entity; that the consumer credit data in NCTUE's database is owned by NCTUE's members, not Equifax, who is not a

NCTUE member; that Equifax designed and created the Insight credit scoring model; that the Insight Score is based, in part, on consumer credit information contained in the NCTUE database; that Equifax's ACIS software platform automatically and without prompting provided ACIS operators with a consumer's Insight Score every time the ACIS operator accessed that consumer's Equifax credit file; that while Equifax, in addition to being a CRA, is also a vendor subject to a Contract with NCTUE to provide database services on behalf of NCTUE, the Contract does not give Equifax carte blanche to access the consumer credit data in NCTUE's files; that while Equifax may wear "two hats" with respect to NCTUE, it is still obligated to comply with the provisions of the FCRA, and when Equifax accessed the data in Plaintiff's NCTUE credit file and combined it with its own credit information through the use of an algorithm to create a credit score, Equifax was not acting as a vendor or in its role of providing database services to NCTUE, but rather Equifax accessed Plaintiff's NCTUE credit file in the process of handling disputes that Plaintiff had made concerning information in his Equifax credit file, not his NCTUE credit file; that Equifax used a series of acronyms to access Plaintiff's NCTUE credit data that tended to obscure the purpose of the access; that Plaintiff never authorized Equifax to use its vendor status to access the data in Plaintiff's NCTUE credit file for its own purposes;

and that Equifax did so with NCTUE's implied, if not actual, knowledge and tacit consent.[13]

This evidence is sufficient to defeat Defendants' motion for summary judgment on the willfulness issue.  See Malverty v. Equifax Info. Servs., LLC, No: 8:17-CV-1617-T-27AEP, 2019 WL 5295150, at *8 (M.D. Fla. Oct. 18, 2019) (granting a portion of the defendant's motion for summary judgment, but denying the motion on the issue of willfulness); Graham v. Pyramid Healthcare Sols., Inc., No. 8:16-cv-1324-T-30AAS, 2017 WL 2799928, at *3 (M.D. Fla. June 28, 2017) ("[T]he question of whether the alleged violations of § 1681b(b)(2) were knowing or reckless must be left to the finder of fact and Defendant's motion for summary judgment is denied with respect to this issue."); Miller v. Johnson & Johnson, No. 613CR1016ORL40KRS, 2015 WL 12835668, at *2 (M.D. Fla. Jan. 22, 2015) ("As noted by the Court in its Order, numerous decisions among the federal courts hold that the determination of willfulness and negligence under the FCRA is reserved for the trier of fact."); Cowley v. Burger King Corp., No. 07-21772-CIV, 2008 WL 8910653, at *3 (S.D. Fla. May 23, 2008) ([W]illfulness under the FCRA is understood to be a question of fact for the jury.").

---

[13]  Plaintiff argues that the "inescapable fact is that every step in this process was deliberate."  [Doc. 48-1 at 23].

For the reasons stated, I RECOMMEND that Defendants' motion for summary judgment on Plaintiff's willfulness claims be DENIED, and that Defendants' motion be DENIED in its entirety.

**B.    PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

In Plaintiff's motion for partial summary judgment, he argues that the Court should rule as a matter of law that Defendants violated the FCRA willfully, as set forth in Counts One and Three.  [Doc. 48-1 at 19–25].  As noted above, willfulness is typically a question of fact for the jury.  In analyzing Plaintiff's motion, the Court must view the facts in the light most favorable to Defendants.

Viewed in this light, the evidence shows that Equifax serves as NCTUE's vendor pursuant to a longstanding Contract between NCTUE and Equifax.  [Doc. 63 ¶ 11].  In that role, Equifax provides operational services to NCTUE, including responding to consumer disputes and managing the NCTUE database.  [Id. ¶ 9; Doc. 53-2 at ¶ 9].  Under the terms of the Contract, Equifax agreed to comply with the terms of the FCRA in its use and management of NCTUE's data, and NCTUE had reason to believe that Equifax would comply with the FCRA based on a number of factors, including periodic audits of Equifax, quarterly meetings, and frequent calls to discuss operational issues.  [Doc. 63 ¶ 12; Doc. 64 at 13].  The Insight score "is a credit scoring model that was developed by Equifax, and is based, in part, on

information contained in a consumer's NCTUE credit file," including Plaintiff's. [Doc. 64 at 6-7]. Equifax did not obtain Plaintiff's entire NCTUE credit file, showing all of Plaintiff's utility creditors, identifying information, full account histories, and similar credit information such as what would be provided to NCTUE's members upon request. Equifax operators did not see or have the ability to access Plaintiff's NCTUE credit file, and were only shown the three-digit Insight Score when viewing Plaintiff's Equifax file. Plaintiff has pointed to no evidence that Equifax ever distributed the Insight Score or any component data thereof, to an outside third party; it was only "exchanged, in the form of an Insight Score viewable by Equifax's operators, between Equifax and NCTUE." [Doc. 64 at 12; Doc. 53-1 at 23-24]. In 2018, upon learning of the circumstances that gave rise to this lawsuit, NCTUE asked Equifax to stop using NCTUE information to calculate Insight Scores, and Equifax did so.[14] [Doc. 64 at 13]. Defendants argue that there is no prior case law holding or regulatory finding that data, such as the NCTUE data at issue in this case, is a "consumer report," and without clear authority to the contrary, Defendants' use of the data does not amount to a willful violation of the FCRA. [Doc. 53-1 at 24].

---

[14] Plaintiff contends that NCTUE told Equifax to stop accessing NCTUE data reports in 2016, as Mr. Moore testified in his deposition. But the Court is constrained to view the facts in the light most favorable to Defendants, the nonmovants, when analyzing Plaintiff's motion for summary judgment.

Plaintiff has presented no on-point, applicable caselaw in which a plaintiff has been awarded summary judgment on the same or similar type of willfulness claims under the FCRA.[15]  In the absence of such authority, and given the repeated guidance from other courts that the willfulness issue should be left to the jury, I RECOMMEND that Plaintiff's partial motion for summary judgment on the issue of willfulness be left to the jury.[16]

## VI. CONCLUSION

For the reasons discussed above, I **RECOMMEND** that the parties' cross-motions for summary judgment [Docs. 48, 53] be **DENIED**.  It is **HEREBY ORDERED** that Plaintiff's Motion to Strike the Roper Declaration [Doc. 73] is **DENIED**.

---

[15]  There is also a genuine issue of material fact as to when NCTUE first learned that Equifax was accessing or obtaining NCTUE consumer data without a permissible purpose.

[16]  In Plaintiff's cross-motion for partial summary judgment, Plaintiff did not argue that he should be granted summary judgment as to any alleged negligent violation of the FCRA.  [Doc. 48-1 at 20–25].

**IT IS SO  RECOMMENDED AND ORDERED**, this 15th day of January, 2020.


_____
CATHERINE M. SALINAS
UNITED STATES MAGISTRATE JUDGE