## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| GLENN HEAGERTY, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | |
| v. | ) | 1:18-cv-01233-CAP-CMS |
| | ) | |
| EQUIFAX INFORMATION | ) | |
| SERVICES LLC and NATIONAL | ) | |
| CONSUMER TELECOM & | ) | |
| UTILITIES EXCHANGE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' COMBINED OBJECTIONS TO FINAL REPORT AND RECOMMENDATION

J. Anthony Love
King & Spalding LLP
1180 Peachtree Street N.E.
Atlanta, Georgia 30309-3521
Tel: (404) 572-4600
Fax: (404) 572-5100
Email: tlove@kslaw.com
*Attorney for Defendants Equifax Information Services LLC and National Consumer Telecom & Utilities Exchange, Inc.*

## I.    <u>INTRODUCTION</u>

Defendants, Equifax Information Services LLC ("Equifax") and National Consumer Telecom & Utilities Exchange, Inc. ("NCTUE") (collectively, "Defendants"), by counsel, submit their combined objections to the Magistrate's Final Report and Recommendation [76] ("R&R"). The R&R, which recommends denial of Defendants' Motion for Summary Judgment [53] ("Motion"), contains at least three errors.

First, the Magistrate's conclusion that Plaintiff has Article III standing is based on non-binding case law that is both procedurally and factually inapposite to the unique and unprecedented facts of this case. The Magistrate concluded that because *Ruk v. Crown Asset Mgmt.*, No. 1:16-cv-3444-LMM-JSA. 2017 WL 3085282 (N.D. Ga. Mar. 22, 2017), and other cases like it, recognized a concrete privacy harm resulting from impermissible disclosures of credit information, any purported violation of that statute—even a hyper-technical violation—necessarily results in concrete harm. But if the Supreme Court's opinion in *Spokeo v. Robins*, 136 S. Ct. 1540 (2016), means anything, it means that the concreteness analysis depends on the specific facts of each case, as not all violations of a statute will result in concrete harm. The undisputed facts of this case show that the only "credit information" disclosed consisted of limited data attributes summarizing Plaintiff's

non-traditional credit accounts, that data was merely transmitted between consumer reporting agencies ("CRAs") and was never viewed by humans, and it was not used for determining Plaintiff's eligibility for credit, insurance, or employment. Application of *Ruk* to these unique facts would stretch the concept of "concrete harm" to unprecedented lengths.

Second, the Magistrate's conclusion that Plaintiff's self-serving testimony of emotional distress is sufficient to survive summary judgment was based on an incorrect statement of law in *Smith v. E-Backgroundchecks.com, Inc.*, 81 F. Supp. 3d 1342, 1357 (N.D. Ga. 2015). The majority of courts—including this one—have held that a plaintiff must present corroborating evidence of emotional distress to withstand summary judgment. Plaintiff failed to do so.

Third, the Magistrate erroneously concluded that Defendants are not entitled to judgment as a matter of law on Plaintiff's willfulness claims. The Magistrate ignored the framework of *Safeco v. Barr*, 551 U.S. 47 (2007)*, and without finding that Defendants' interpretation of the FCRA was objectively unreasonable, concluded that whether Defendants willfully violated the FCRA was an issue of fact. But the text of the FCRA and the authoritative guidance show that Defendants' interpretation of the FCRA was *not* objectively unreasonable, because it is not clearly established that the information obtained was a "consumer report," and

because CRA-to-CRA transfers of consumer credit information, as occurred here, are permitted. Plaintiff's willfulness claims fail as a matter of law.

## II.   **LEGAL STANDARD**

In reviewing a report and recommendation, the district court must make a *de novo* determination of those portions of the report and recommendation to which an objection is made. 28 U.S.C. § 636(b). Even in the absence of an objection, the district judge also reviews legal conclusions *de novo*. *See Cooper-Houston v. S. Ry. Co.*, 37 F.3d 603, 604 (11th Cir. 1994). A *de novo* review requires independent consideration of factual issues based on the record. *Diaz v. United States*, 930 F.2d 832, 836 (11th Cir. 1991).

## III.   **ARGUMENT**

### A. The Magistrate Erred in Concluding that Plaintiff Has Established A Concrete Injury In Fact Sufficient to Confer Article III Standing.

To establish Article III standing, a plaintiff must prove that he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The "first and foremost" element of standing—injury in fact—requires Plaintiff to prove that he "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1547-48 (quoting *Lujan*

*v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Because injury in fact is the "irreducible constitutional minimum" of standing, Congress "cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Id.* Thus, the injury-in-fact requirement is not met simply because "a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id.* at 1549.

Plaintiff claims that he satisfies the injury-in-fact requirement because he suffered an invasion of privacy when Equifax accessed the data in his NCTUE credit file. Pl.'s Opp'n. to Defs.' Mot., Dkt. No. [62] at 4-5. The Magistrate incorrectly concluded that Plaintiff's purported injury is sufficiently "concrete" to confer Article III standing.

To be "concrete," the "injury must be '*de facto*'; that is, it must actually exist." *Spokeo*, 136 S. Ct. at 1548. Although intangible injuries are sometimes sufficient, "abstract" injuries are not. *Id.* at 1548-49. In determining whether an intangible harm constitutes injury in fact, courts must look to "history and the judgment of Congress" by considering whether the "intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit" at common law, and whether Congress has elevated the intangible harm to the status of legally cognizable injury. *Id.* at 1549.

4

The Magistrate failed to apply this analytical framework to the specific, unique facts of this case. Instead, the R&R's analysis is based on Plaintiff's overly-vague description of his injury: "the unauthorized disclosure of his NCTUE credit data to Equifax." R&R at 30. The Magistrate relied on conclusions reached by other courts—in procedurally and factually distinct contexts—that "'individuals have standing to sue for the impermissible disclosure of their credit information,' [because] the FCRA creates a substantive right to privacy with regard to access to an individual's sensitive credit information." R&R at 33 (quoting *Ruk v. Crown Asset Mgmt.*, No. 1:16-cv-344-LMM-JSA, 2017 WL 3085282, at *4 (N.D. Ga. Mar. 22, 2017) and citing *Burke v. Fed. Nat'l Mortg. Assoc.*, No. 3:16-cv-153-HEH, 2016 WL 4249496, at *4 (E.D. Va. Aug. 9, 2016), *vacated*, 2016 WL 7451624 (E.D. Va. Dec. 6, 2016)). But the "impermissible disclosure of credit information" is just another way to describe a violation of 15 U.S.C. § 1681b, and the Supreme Court made clear in *Spokeo* that not all statutory violations are created equal. By the Magistrate's logic, all plaintiffs alleging a violation of § 1681b would automatically have standing. That erroneous conclusion erases Article III's requirement of "a concrete injury even in the context of a statutory violation." *Spokeo*, 136 S. Ct. at 1549.

*Spokeo* demonstrates why it is important to analyze the specific facts that give rise to a statutory violation. There, the plaintiff alleged the defendant violated § 1681e(b) of the FCRA by publishing inaccurate information about him. The Court explained that although the purpose of the FCRA was to "curb the dissemination of false information by adopting procedures designed to decrease that risk . . . *not all inaccuracies cause harm*." *Id.* at 1550 (emphasis added). As an example, the Court noted that "the dissemination of an incorrect zip code, without more"—which would technically violate § 1681e(b)—would not cause any concrete harm. *Id.* Thus, the concreteness analysis must focus on the specific conduct at issue ("the dissemination of an incorrect zip code") because a generalized description of the conduct ("the dissemination of false information") will always appear to align with the type of harm Congress sought to prevent.

The Eleventh Circuit recently applied this level of specificity in analyzing whether an alleged invasion of privacy resulting from a violation of the Telephone Consumer Protection Act ("TCPA") was sufficiently concrete. *Salcedo v. Hanna*, 936 F.3d 1162, 1171-73 (11th Cir. 2019). There, the court acknowledged that it has recognized as concrete the invasion of privacy resulting from receipt of unwanted faxes and telephone calls in violation of the TCPA, but explained that the plaintiff's receipt of a text message was qualitatively different. The Eleventh Circuit found that

6

the TCPA reflected congressional concern for privacy within the home, but concluded that those concerns do not necessarily apply to text messages. The court further found that the common law tort of intrusion upon seclusion would only recognize invasions of privacy that are "highly offensive to a reasonable person," and receipt of a text message falls well short of that standard.

Pursuant to *Spokeo* and *Salcedo*, the Magistrate should have analyzed the specific facts in the record, including the type of credit information disclosed, to whom it was disclosed, how the information was used, and the impact (or lack thereof) on Plaintiff. As the Magistrate acknowledged, there is no controlling authority holding that the invasion of privacy resulting from the unauthorized disclosure of credit information is a concrete injury in fact. And the nature of the purported privacy injury at issue here is qualitatively different from the privacy harm that *Ruk* and a few other cases have recognized as legally cognizable; the privacy interests with which Congress was concerned; and the invasions of privacy actionable at common law. The undisputed facts demonstrate that Plaintiff had a minimal privacy interest, if any, in the specific credit information disclosed. And there was no actual harm to that privacy interest because the information was disclosed only in the abstract sense, to a CRA that did not use the information in any way that affected Plaintiff.

1.  <u>The Information Disclosed Does Not Implicate Significant Privacy Interests.</u>

The undisputed evidence shows that Equifax accessed only certain limited information from Plaintiff's NCTUE credit file, not the whole file. NCTUE did not release a data report—its version of a traditional credit report—which would consist of detailed, specific information about each of Plaintiff's telecommunication, pay TV, and utility service accounts. Rather, certain of NCTUE's data attributes, which are numbers that summarize a particular aspect of the credit file, were accessed by Equifax. The data attributes related to Plaintiff's account payment history, the number of accounts, the type of accounts, his available credit, his credit used, and the length of his credit history (the "Data Attributes"). And because NCTUE only collects information from telecommunication, pay TV, and utility service providers, the Data Attributes do not summarize traditional credit information like mortgage accounts, auto loans, credit cards, bankruptcies, or public records.

Neither the Supreme Court nor the Eleventh Circuit have recognized as legally cognizable the invasion of privacy resulting from the unauthorized disclosure of credit information. And Defendants cannot find any court that has ever recognized a right to privacy in the specific type of information disclosed here. In the cases the Magistrate relied on recognizing a right to privacy in "credit information," the courts considered full credit reports of traditional credit information or background checks,

8

which are far more specific, extensive, and sensitive than the Data Attributes. *See Ruk*, 2017 WL 3085282, at *1 (finding concrete privacy injury based on the allegation, accepted as true, that plaintiff's "credit report" was accessed by a creditor's successor in interest); *Burke*, 2016 WL 4249496, at *1 (finding concrete privacy injury based on the allegation that defendant "obtain[ed] her credit report under the false pretense of an 'account review'"); *Thomas v. FTS USA, LLC*, 193 F. Supp. 3d 623, 628 (E.D. Va. 2016) (finding invasion of privacy where employer obtained background check containing criminal history and driving record).[1]

Further, the specific type of "credit information" disclosed here does not implicate the privacy concerns that Congress sought to address. In 1969, when

---

[1] Moreover, there is significant reason to question the holdings in these cases. *Ruk* relied heavily on *Burke*, which relied on *Thomas*. But *Burke* was vacated due to the parties' stipulation that the court did not have subject matter jurisdiction. 2016 WL 7451624 (E.D. Va. Dec. 6, 2016). Further, the same judge who authored the *Burke* opinion, Judge Henry Hudson, later reached the opposite conclusion in *Dilday v. Directv, LLC*, No. 3:16cv996-HEH, 2017 WL 1190916, at *4 (E.D. Va. March 29, 2017). There, Judge Hudson held that a plaintiff did *not* establish a concrete injury simply by alleging that a CRA disclosed his credit report in violation of § 1681b. Judge Hudson distinguished *Thomas* on the basis the Fourth Circuit's subsequent decision in *Beck v. McDonald*, 848 F.3d 262, 266 (4th Cir. 2017), "add[ed] instructive clarity to the concrete injury analysis." *Dilday*, 2017 WL 1190916, at *3. Following the teachings of *Beck*, Judge Hudson analyzed the common law privacy torts and concluded that "[b]ecause the common law does not permit suit for merely sharing private information with a single third party, a violation of the FCRA's prohibition on furnishing a consumer report absent a permissible purpose cannot, standing alone, be understood to constitute a concrete injury." *Id.* at *4.

Senator Proxmire introduced Senate Bill 823, which later became the FCRA, credit files included not only "information on a person's financial status, bill paying record, and items of public record such as arrests, suits, judgments and the like," but also "information on drinking, marital discords, adulterous behavior, as well as a person's general reputation, habits and morals." 115 Cong. Rec. 2410 (Jan. 31, 1969), attached as Ex. A. Congress was concerned about privacy because credit bureaus collected such highly-sensitive information, but their vague policies as to whom they would furnish the information allowed for its misuse. As examples, Senator Proxmire described a law professor who obtained a credit report about a research assistant, which included "information on her marital and financial status, previous employment record, police record, character, habits, and morals." 115 Cong. Rec. 2413 (Jan. 31, 1969). He also described complaints of "a labor union obtaining credit reports on prospective jurors in a Federal prosecution, and of credit reports being obtained to check on prospective husbands or sons-in-law." *Id.*

The Data Attributes do not disclose the same type of highly-sensitive information with which Congress was concerned. NCTUE collects payment information from telecommunications, pay TV, and utility service providers. Thus, the Data Attributes do not reflect information about a consumer's employment

history, arrest records, "drinking, marital discord, adulterous behavior," or any other aspect of a person's moral character.

Congress has also recognized that consumers have reduced privacy interests when only limited information, short of a traditional credit report, is at issue. *See, e.g.*, 15 U.S.C. § 1681b(c) (permitting disclosure of limited credit information without consumer authorization in exchange for firm offer of credit or insurance); 15 U.S.C. § 1681f (permitting disclosure of a consumer's identifying information to government agencies without a permissible purpose). For example, Congress amended the FCRA in 1996 to allow for prescreening, which permits the disclosure of certain information about consumers who meet certain credit criteria, *without their authorization*. A prescreened list can include the consumer's name, address, and other information "that does not identify the relationship or experience of the consumer with respect to a particular creditor or other entity." 15 U.S.C. § 1681b(c)(2)(C). The Data Attributes are analogous to this non-specific type of information disclosed in a prescreened list, but unlike the information disclosed in a prescreened list, Plaintiff's Data Attributes did not reflect information about his traditional credit accounts, any bankruptcies, or other public records.

Courts have also recognized that the limited information disclosed in prescreened lists does not implicate the same privacy concerns as a traditional credit

report. *See Sullivan v. Greenwood Credit Union*, 520 F.3d 70, 77 (1st Cir. 2008) (affirming summary judgment for defendant on § 1681b claim, noting there was only a "minimal invasion of privacy," because defendant "never received [plaintiff's] full credit report . . . [but] only the plaintiff's contact information and that he met certain pre-selection criteria"). At least one Circuit Court of Appeals has held that there is no concrete injury where a plaintiff's credit information appeared on a prescreened list that was released in error to an unauthorized user. *Crabtree v. Experian Info. Sols., Inc.*, --- F.3d ---, Nos. 18-34168 & 18-3504, 2020 WL 428938, *5 (7th Cir. Jan. 28, 2020) (holding that contractually unauthorized exchange of information, "without more, does not suffice to establish a concrete injury-in-fact for Article III purposes."). The disclosure of limited personal information, even in violation of a statute, does not establish an injury in fact. *See Hancock v. Urban Outfitters, Inc.*, 830 F.3d 511, 515 (D.C. Cir. 2016) (holding allegations that retailers requested and recorded consumers' zip codes insufficient to establish concrete injury).

2.  Plaintiff's Minimal Privacy Interest Was Not Invaded.

Not only does the nature of the "credit information" in this case distinguish it from the cases that have found a concrete privacy injury, but the nature of the disclosure here is different. Here, no Equifax employee—or any other human—saw the Data Attributes. Defs.' Stmt. of Material Facts ("DSMF"), Dkt. No. [53-2] ¶¶ 40,

42, 44. Rather, the disclosure was the result of an automatic process in which Equifax's algorithm used the Data Attributes, along with data from Equifax's own credit file on Plaintiff, to calculate an Insight Score. DSMF ¶ 40. Thus, although Equifax "obtained" the Data Attributes, it did so only in the abstract sense. To the extent the Data Attributes were private, that privacy was not invaded in any real way. *Cf. Thomas*, 193 F. Supp. 3d at 627 (finding invasion of privacy where plaintiff's employer obtained and reviewed his background check).

It is also important that Equifax is not an end user, but a CRA subject to the same consumer protection restrictions as NCTUE. *See Harmon v. RapidCourt, LLC*, No. 17-5688, 2018 WL 6062355, at *5 (E.D. Pa. Nov. 20, 2018) (holding that "harms arising solely from disclosure of information *to a consumer reporting agency* . . . do not satisfy the Article III injury requirement")[2]; *New Hampshire v. Credit Bureau of Nashua, Inc.*, 342 A.2d 640, 644 (N.H. 1975) (holding transfer of

---

[2] The Magistrate found that *Harmon* was inapposite because it "was an employment case, not a privacy case, and it was decided on a motion to dismiss," and the plaintiff did not allege a violation of his right to privacy or a violation of the permissible purpose provision. R&R at 39. But *Harmon* is instructive, regardless of whether that plaintiff's FCRA claims arose under the same provision, because he alleged his emotional injuries resulted solely from the disclosure of information from one consumer reporting agency to another. Similarly, Plaintiff's only evidence of injury is that NCTUE disclosed his information to Equifax, which caused him emotional harm. The *Harmon* court's holding that "disclosure of information *to a consumer reporting agency*" does not cause concrete harm is directly applicable to this case. 2018 WL 6062355, at *5.

consumer credit files from CRA to CRA did not undermine privacy aims of statute "since the use of the information in the files by the recipient agency would be circumscribed by the protective provisions of the [FCRA]"). NCTUE understood that Equifax would not use the Data Attributes to take any action towards Plaintiff. Rather, Equifax pulled the Data Attributes to calculate the Insight Score, which it could have provided to an end user (including Plaintiff) with a permissible purpose. *See* Contractor Services Agreement between NCTUE and Equifax ("Contractor Agreement") §§ 2.15(e), 2.17(a), & Ex. F, Dkt. No. [51-2] at 8, 10, 57-58 (providing that Equifax would act as a reseller with respect to pulling NCTUE data for calculation of a credit score). The FCRA expressly permits such CRA-to-CRA disclosures. *See* 15 U.S.C. § 1681a(u) (defining "reseller" as a CRA that "assembles and merges information contained in the database of another [CRA] . . . for purposes of furnishing such information to any third party"); FTC Staff Report (2011) at 41, attached as Ex. B ("A CRA may furnish a consumer report to another CRA, so that the second CRA can sell such reports to subscribers with a permissible purpose."); *cf.* 16 C.F.R. § 660.2(c)(2) (excluding from the definition of "furnisher" a CRA when it provides consumer information to another CRA). Defendants are not aware of any court that has ever found an invasion of privacy or any other concrete harm resulting from the disclosure of consumer credit information *to* a CRA.

14

Further, because Equifax never provided Plaintiff's Insight Scores to any third party, the Data Attributes were never "used," even indirectly, in any way that affected Plaintiff. No creditor, insurance company, or potential employer used the Data Attributes to make a decision about Plaintiff. *Cf. Thomas*, 193 F. Supp. 3d at 628 (employer obtained background checks on employees without their knowledge and used plaintiff's background check to deny him a job). No one used the Data Attributes to market to Plaintiff. *Cf. Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 269 (finding allegations that defendant collected and disclosed consumers' identifying information and web browsing data to third party to use for targeted advertising sufficient to establish standing). Plaintiff would not have been aware of the disclosures had he not spent over 18 months "investigat[ing] the situation." *See* Heagerty Decl., Dkt. No. [48-3] ¶¶ 4-11; *Crabtree*, 2020 WL 428938, at *5 (holding that plaintiff had not identified concrete harm because if his lawyer had not informed him of the unlawful disclosure he "would have gone on completely unaware of and unaffected by any prescreened list"). This purported "invasion of privacy" is not sufficient to establish a concrete injury in fact. *Oneal v. First Tennessee Bank*, 2018 WL 1352519, at *9 (E.D. Tenn. March 15, 2018) (dismissing complaint for lack of standing, finding "an alleged invasion of privacy resulting from an improper credit inquiry, without more, does not constitute a concrete injury in fact").

15

History also tells us that Equifax's access of the Data Attributes does not give rise to an actionable privacy harm. As the court in *Dilday* explained, invasion of privacy at common law encompassed four distinct wrongs, and the wrong most closely associated with the FCRA's prohibition on the unauthorized disclosure of a consumer report is "publicity given to private life."  2017 WL 1190916, at *4 (holding allegations that defendant invaded plaintiff's privacy when it "obtained his consumer report" without a permissible purpose was insufficient to establish a concrete injury). However, that cause of action only applies when "'the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.'" *Id.* (quoting Restatement (Second) of Torts § 652D cmt. a (1977)). Here, there is no contention that Plaintiff's Data Attributes were publicized. Because "the common law does not permit suit for merely sharing private information with a single third party," Plaintiff's purported privacy injury is not closely related to any traditional harm that would have provided a basis for a lawsuit at common law. Accordingly, Plaintiff has failed to demonstrate a concrete injury in fact sufficient to confer Article III standing.[3]

---

[3] Plaintiff also contends that as a result of the "repeated violations of his right to privacy" he suffered emotional distress. Pl.'s Opp. at 17. But emotional distress

**B. The Magistrate Erroneously Concluded That Plaintiff's Self-Serving Testimony of Emotional Distress Is Sufficient To Withstand Summary Judgment.**

The Magistrate concluded that Plaintiff's claim for emotional distress could survive summary judgment simply because he "has submitted his own testimony of emotional harm." R&R at 61 (citing *Smith v. E-Backgroundchecks.com, Inc.*, 81 F. Supp. 3d 1342, 1347 (N.D. Ga. 2015)).[4] This conclusion is contrary to the holdings of the overwhelming majority of courts, including this one, that "emotional distress requires a 'degree of specificity' and 'must be supported by evidence of genuine injury,' such as 'the observations of others,' 'corroborating testimony,' or 'medical or psychological evidence.'" *Bacharach v. Suntrust Mortg., Inc.*, 827 F.3d 432, 436 (5th Cir. 2016) (quoting *Cousin v. Trans Union Corp.*, 246 F.3d 359, 371 (5th Cir. 2001)); *Cousin*, 246 F.3d at 371 (citing *Carey v. Piphus*, 435 U.S. 247, 264 n.20 (1978)); *Wantz v. Experian Info. Sols.*, 386 F.3d 829, 834 (7th Cir. 2004), *abrogated*

---

arising from a nonconcrete invasion of privacy injury does not confer Article III standing. And in any event, Plaintiff's evidence of emotional distress is insufficient.
[4] The Magistrate also notes that "Plaintiff has also pointed to documentary evidence (the Roper email exchange) describing his emotional harm." R&R at 61. In the email to Ms. Roper, Equifax's attorney from a prior lawsuit, Plaintiff describes the inquiries on his NCTUE disclosure and notes that it is "terrifying to think people were monitoring me during the case, violating my privacy." Dkt. No. [48-3] at 12-15. This statement does not "describ[e] [Plaintiff's] emotional harm," and even if it did, it is not corroborating evidence. The email comes from the same source—Plaintiff—and the context in which it was written shows that he was laying the groundwork for *this lawsuit*.

*on other grounds by Safeco*, 551 U.S. at 57; *Smith v. LexisNexis Screening Sols*., Inc., 837 F.3d 604, 611 (6th Cir. 2016); *Taylor v. Corelogic Saferent, LLC*, No. 1:13-CV-03435-CAP-JFK, 2014 WL 11930592, at \*8 (N.D. Ga. Oct. 23, 2014); *Riley v. Equifax Credit Info. Servs.*, 194 F. Supp. 2d 1239, 1244-45, 1248 (S.D. Ala. 2002); *see also Simmons v. N. Am. Asset Inv. Bureau, LLC*, No. 1:07-CV-2477-CC-RGV, 2008 WL 11470703, at \*3 (N.D. Ga. May 12, 2008), *report and recommendation adopted*, 2008 WL 11470702 (N.D. Ga. June 5, 2008) (Fair Debt Collections Practices Act case).

The Magistrate relied on *Smith v. E-Backgroundchecks.com*, which stated: "[i]n FCRA cases, a plaintiff is not required to produce evidence of emotional distress beyond his own testimony." 81 F. Supp. 3d at 1347, 1366 (quoting *King v. Asset Acceptance, LLC*, 452 F. Supp. 2d 1272, 1281 (N.D. Ga. 2006)). *King* relied exclusively on a footnote in *Moore v. Equifax Information Services, LLC*, 333 F. Supp. 2d. 1360, 1365 n.3 (N.D. Ga. 2004) which states:

> [Defendant's] contention that the Eleventh Circuit requires evidence of an objective manifestation of emotional distress is without merit. The Eleventh Circuit vacated the only authority cited by [Defendant] for this proposition. *See Jones v. CSX Transp.*, 337 F.3d 1316 (11th Cir. 2003), *vacating in relevant part Jones v. CSX Transp.*, 287 F.3d 1341 (11th Cir. 2002). Other courts have not applied this tort rule to FCRA cases. *See Johnson v. Dep't of Treasury*, 700 F.2d 971, 984-85 (5th Cir. 1983).

*Id.* That footnote does not support the proposition that an FCRA plaintiff can rely on his own self-serving testimony of emotional distress to survive summary judgment. In *Jones*, the Eleventh Circuit vacated its prior ruling that a plaintiff must produce evidence of objective manifestations of emotional distress based on the Supreme Court's holding in a similar case that "a plaintiff who has asbestosis can recover damages for fear of cancer if the alleged fear is 'genuine and serious'" *Jones*, 337 F.3d at 1317 (quoting *Norfolk & Western Ry. Co. v. Ayers*, 538 U.S. 135, 157-58 (2003)). While evidence of "objective manifestation" of emotional distress is not required, the "genuine and serious" standard still requires evidence beyond a plaintiff's own testimony of emotional distress. *See Ayers*, 538 U.S. at 158 n.18 (finding the evidence at trial was "notably thin" and likely would have "succumbed to a straightforward sufficiency-of-the-evidence objection," had defendant raised one, because "no claimant presented corroborative objective evidence of his fear").

Further, *Johnson* was a Privacy Act case that compared the term "actual damages" in the statute to the same term used in the FCRA to reach the unremarkable conclusion that actual damages can include emotional distress damages. 700 F.2d at 983-84, *abrogated on other grounds by Doe v. Chao*, 124 S. Ct. 1204 (2004). In dicta, the *Johnson* court noted the tort rule requiring *physical manifestations* of emotional distress had been rejected in the FCRA context. *Id.* at 984-85 (citing

*Millstone v. O'Hanlon Reports, Inc.*, 528 F.2d 829, 834-35 (8th Cir. 1976)). The *Johnson* court concluded, however, that the plaintiff was "entitled to compensation under the [Privacy] Act for his *proven* mental and physical injuries." *Id.* at 986 (emphasis added). *Johnson* does not hold that a plaintiff's testimony of emotional distress is sufficient to withstand summary judgment. If it did, it would no longer be good law given that the Fifth Circuit has repeatedly required "evidence of genuine injury, such as the evidence of the injured party's conduct[,] the observations of others . . . corroborating testimony or medical or psychological evidence." *Cousin*, 246 F.3d at 371 (citing *Carey*, 435 U.S. at 264 n.20); *Bacharach*, 827 F.3d at 436.

Simply put, *Moore* only meant that "objective manifestations" of emotional distress are not required, and *Smith* and *King* were wrong to conclude that a plaintiff's self-serving testimony of emotional distress is all that is required. Because Plaintiff has not presented any evidence beyond his own testimony, Defendants are entitled to summary judgment on Plaintiff's claim for emotional distress.

### C. The Magistrate Erroneously Concluded That There Is An Issue of Fact As To Willfulness.

To establish a willful violation, Plaintiff must prove either that Defendants knowingly or recklessly violated the FCRA. To prove a reckless violation, Plaintiff must establish that Defendants' actions were "*not only* a violation under a reasonable reading of the statute's terms," *but also* that Defendants "ran a risk of violating the

law substantially greater than the risk associated with a reading that was merely careless." *Safeco*, 551 U.S. at 69 (emphasis added). As to the first element, Plaintiff must show that Defendants' interpretation of the FCRA was "objectively unreasonable," under either "the text of the Act" or "guidance from the courts of appeal or the Federal Trade Commission that might have warned [Defendants] away from the view [they] took." *Levine v. World Fin. Network Nat'l Bank*, 554 F.3d 1314, 1318 (11th Cir. 2009).

The Magistrate did not find that Defendants' interpretation of the FCRA was objectively unreasonable.[5] Instead, the R&R simply recites the facts regarding Defendants' actions (construed in Plaintiff's favor) and concludes that willfulness is an issue of fact for the jury to resolve. This was error. The Eleventh Circuit has made

---

[5] The R&R cites out-of-circuit case law for the proposition that "courts have allowed a willful noncompliance claim to proceed where a defendant's conduct involves willful misrepresentations or concealments." R&R at 63-64 (quoting *Cousin*, 246 F.3d at 372 (citing *Pinner v. Schmidt*, 805 F.2d 1258, 1263 (5th Cir. 1986))). This conclusion is unfounded for several reasons. First, no party cited *Cousin* or *Pinner*, and Plaintiff neither alleged nor argued that Defendants willfully misrepresented or concealed any FCRA violation from him. Second, both *Cousin* and *Pinner* overturned jury verdicts for punitive damages, holding that the FCRA violations at issue were *not willful as a matter of law*. Third, *Cousin*, *Pinner*, and the cases they cited regarding concealment were all interpreting a pre-*Safeco* understanding of willfulness. *See Stevenson v. TRW Inc.*, 987 F.2d 288, 294 (5th Cir. 1993) ("Only defendants who engaged in 'willful misrepresentations or concealments' have committed a willful violation and are subject to punitive damages under § 1681n."). In light of *Safeco*, those cases are not instructive on the issue of willfulness.

clear that willfulness is an issue of law when it turns on whether the defendant's interpretation of the relevant statute was objectively unreasonable. *Pedro v. Equifax, Inc.*, 868 F.3d 1275, 1283 (11th Cir. 2017).

Here, Defendants reasonably thought transmitting Data Attributes as described above was not construed as the transmission of a "consumer report" under the FCRA, for which § 1681b would apply. Section 1681b provides that a "consumer reporting agency may furnish a consumer report under the following circumstances and no other." 15 U.S.C. § 1681b(a). Defendants' interpretation was not unreasonable for several reasons. First, it was reasonable for Defendants to assume that the Data Attributes, accessed as they were here and never used for the purpose of extending credit, are not "consumer reports." No court has ever held otherwise. Second, the contractual agreement between Defendants establishes that Equifax was acting as a reseller when it obtained the Data Attributes and calculated the Insight Score, and thus no permissible purpose was required.

The FCRA defines "consumer report" as the "communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness . . . which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for" credit, insurance, or employment. 15 U.S.C. § 1681a(d). Defendants reasonably

thought the Data Attributes—the only information NCTUE disclosed—were not a "consumer report" because they were neither used nor expected to be used by Equifax for the purpose of any credit, insurance, or employment decision. Several courts have endorsed this interpretation, holding that information is only a consumer report if it is provided to a third party for the purpose of determining a consumer's eligibility for credit, insurance, or employment. *See, e.g.*, *Hovater v. Equifax, Inc.*, 823 F.2d 413, 418-19 (11th Cir. 1987) (holding information provided to insurance company to evaluate a claim for benefits under an existing policy is not a consumer report because it is not used to determine consumer's eligibility for insurance); *Wantz,* 386 F.3d at 833-34; *Renninger v. ChexSystems*, No. 98 C 669, 1998 WL 295497, at *5 (N.D. Ill. 1998) (holding consumer report "contemplates that the information will be *used* to determine a consumer's eligibility for legitimate credit or employment purposes."). Defendants' interpretation cannot be "objectively unreasonable" given that circuit courts have taken the same approach.

The Magistrate found that Defendants' interpretation was incorrect because NCTUE "collected" the credit data in Plaintiff's NCTUE credit file so that it could be sold to members in the form of data reports for credit purposes. R&R at 46-47. But NCTUE did not disclose Plaintiff's full NCTUE credit file or a "data report" about him to Equifax. Rather, the Data Attributes—which are distinct from the credit

23

data NCTUE collects—were created solely for Equifax's use in calculating an Insight Score. Because the Data Attributes were not "collected" to determine Plaintiff's eligibility for credit, insurance, or employment, it was reasonable to assume they would not constitute a "consumer report." Plaintiff has not pointed to any "guidance . . . that might have warned [Defendants] away from the view [they] took." *Safeco*, 551 U.S. at 70.

Defendants' contractual agreement also provides that Equifax was acting as a "reseller" with respect to its access to the Data Attributes. *See* Contractor Agreement § 2.17. The FCRA defines "reseller" as "a consumer reporting agency that . . . assembles and merges information contained in the database of another consumer reporting agency or multiple consumer reporting agencies concerning any consumer for purposes of furnishing such information to any third party." 15 U.S.C. § 1681a(u). This definition suggests that the disclosure of information from a CRA to a reseller does not require a permissible purpose under § 1681b; only the disclosure of information from the reseller to a third party implicates § 1681b. Guidance from the FTC supports this view:

> A CRA may furnish a consumer report to another CRA, so that the second CRA can sell such reports to subscribers with a permissible purpose. In these circumstances, the receiving CRA must carry out the responsibilities of companies that procure reports for resale, as set forth in section 607(e) [1681e(e)]. If the CRA meets the definition of "reseller," it must also comply with provisions imposed on "resellers."

24

FTC Staff Report (2011) at 41. Here, Equifax did not sell Plaintiff's Insight Score to any third parties, so no permissible purpose was necessary. Plaintiff has not met his burden to show any clearly established law should have warned Defendants that a CRA-to-CRA transfer of information required a permissible purpose.

The absence of any authoritative guidance condemning Defendants' conduct—and the existence of circuit court and FTC guidance condoning it—precludes a finding of willfulness as a matter of law. *Safeco*, 551 U.S. at 70; *Levine*, 554 U.S. at 1319.

Respectfully submitted this 10th day of February, 2020.

KING & SPALDING LLP

By: /s/ *J. Anthony Love*
J. Anthony Love (Ga. Bar No. 459155)
1180 Peachtree Street N.E.
Atlanta, Georgia 30309-3521
Tel: (404) 572-4600
Fax: (404) 572-5100
Email: tlove@kslaw.com
*Attorney for Defendants Equifax Information Services LLC and National Consumer Telecom & Utilities Exchange, Inc.*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that 14-point Times New Roman was used for these objections and that it has been formatted in compliance with Local Rule 5.1.

This 10th day of February, 2020.

*/s/ J. Anthony Love*
J. Anthony Love